SHORT RECORD
NO. 21-2413
Filed: 08/02/2021

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD      :

:

Petitioner      :   No.

v.      :

:   Board Case Nos.:

HAVEN SALON + SPA, INC.      :   18-CA-266091

:   18-CA-267818

Respondent      :

## APPLICATION FOR SUMMARY ENTRY OF A JUDGMENT
## ENFORCING AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

To the Honorable, the Judges of the United States
    Court of Appeals for the Seventh Circuit:

The National Labor Relations Board (the "Board"), pursuant to Section

10(e) of the National Labor Relations Act, as amended (29 U.S.C. §§ 151, 160(e)),

applies to this Court for summary entry of a judgment enforcing its order against

Haven Salon + Spa, Inc. ("Respondent").  The Board is entitled to summary

enforcement of its order in full because Respondent failed to file with the Board

exceptions to the administrative law judge's decision.  In support, the Board

shows:

## A.  Jurisdiction of this Court

This Court has jurisdiction over this application under Section 10(e) of the

Act (29 U.S.C. § 160(e)).  Venue is proper in this Circuit because the unfair labor

practices occurred in Wisconsin.  The Board's final order issued on June 17, 2021.

## B. Proceedings Before the Board

1. The Board's Acting General Counsel issued a Consolidated Complaint and Notice of Hearing in case nos. 18-CA-266091 and 18-CA-267818 on November 24, 2020, charging Respondent with certain violations of the Act. Respondent filed an Answer on December 14, 2020.

2. Following a hearing before Administrative Law Judge Sharon Levinson Steckler, the judge issued a decision on April 30, 2021, finding that Respondent had violated the Act and recommending that an order be issued requiring that the Respondent cease and desist from the unfair labor practices found, and take certain affirmative action to remedy those unfair labor practices, including posting an appropriate notice.

3. On May 28, 2021, the Board issued an order transferring the proceeding to the Board and notifying the Respondent that the Board must receive exceptions to the administrative law judge's decision within 28 days from the issuance of the order (June 25, 2021).

4. Section 10(c) of the Act (29 U.S.C. § 160(c)) provides that "if no exceptions are filed [with the Board] within twenty days after service [of the administrative law judge's decision] upon the parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed." Section 102.46 and 102.48

of the Board's Rules and Regulations (29 C.F.R. 102.46 and 102.48) implement

this provision and provide that, in the event no exceptions are filed within 28 days,

the decision of the administrative law judge shall be adopted by the Board and all

objections and exceptions thereto are waived for all purposes.

    5.  Respondent did not file exceptions with the Board or ask for an extension

of time.

    6.  In the absence of any exceptions to the administrative law judge's

decision, on June 17, 2021, the Board issued an order adopting the administrative

law judge's findings and conclusions and directing the Respondent to take the

action set forth in the Judge's recommended order.

### C.  The Board Is Entitled to Summary Enforcement of Its Order

    The Board is entitled to summary entry of a judgment enforcing its order

because, by failing to file exceptions with the Board challenging the administrative

law judge's decision, the Respondent failed to raise any issues before the Board.

    Section 10(e) of the Act (29 U.S.C. § 160(e)) provides that "no objection

that has not been urged before the Board . . . shall be considered by the court,

unless the failure or neglect to urge such objection shall be excused by

extraordinary circumstances."  This limitation is jurisdictional and its application is

mandatory.  *Woelke & Romero Framing v. NLRB*, 456 U.S. 645, 666-67 (1982).

Interpreting this requirement, this Court and other circuits have consistently held

that a respondent's failure to file any exceptions before the Board entitles the

Board, absent extraordinary circumstances, to summary entry of a judgment

enforcing its order.  *NLRB v. Dominick's Finer Foods*, 28 F.3d 678, 685-86 (7th

Cir. 1965).  *Accord, e.g., NLRB v. Tri-State Warehouse & Distrib.,*677 F.2d 31, 31

(6th Cir. 1982); *NLRB v. Int'l Union of Operating Eng'rs, Local 86,* 357 F.2d 841,

846-47 (3d Cir. 1966); *NLRB v. Pugh & Barr, Inc*., 194 F.2d 217, 218-21 (4th Cir.

1952).  No extraordinary circumstances are present here.

WHEREFORE, the Board respectfully requests that the Court take

jurisdiction of the proceedings, serve notice of the filing of this application upon

Respondent, and enter judgment summarily enforcing the Board's order in full.  A

proposed judgment is attached.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, S.E.
Washington, D.C.  20570


Dated in Washington, D.C.
this 2nd day of August, 2021

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | : | |
| | : | |
| Petitioner | : | No. |
| v. | : | |
| | : | Board Case Nos.: |
| HAVEN SALON + SPA, INC. | : | 18-CA-266091 |
| | : | 18-CA-267818 |
| Respondent | : | |

CERTIFICATE OF SERVICE

The undersigned certifies that one copy each of the Board's application for summary entry of judgment and proposed judgment, in the above-captioned case, has this day been served by first class mail upon the following parties at the addresses listed below:

Timothy Dillett, Owner          Carley Dillett, Registered Agent
Haven Salon + Day Spa, Inc.     Haven Salon + Day Spa, Inc.
W145S7644 Durham Drive          W145S7644 Durham Drive
Muskego, WI 53150               Muskego, WI 53150

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, S.E.
Washington, D.C.  20570

Dated at Washington, D.C.
this 2nd day of August, 2021

Muskego, WI

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

HAVEN SALON + SPA, INC.                              Cases 18-CA-266091
                                                                          18-CA-267818
     and

KATHERINE REHM


**ORDER**

On April 30, 2021, Administrative Law Judge Sharon Levinson Steckler of the National Labor Relations Board issued her Decision in the above-entitled proceeding and, on the same date, the proceeding was transferred to and continued before the Board in Washington, D.C. The Administrative Law Judge found that the Respondent has engaged in certain unfair labor practices and recommended that it take specific action to remedy such unfair labor practices.

No statement of exceptions having been filed with the Board, and the time allowed for such filing having expired,

Pursuant to Section 10(c) of the National Labor Relations Act, as amended, and Section 102.48 of the National Labor Relations Board Rules and Regulations, the Board adopts the findings and conclusions of the Administrative Law Judge as contained in her Decision, and orders that the Respondent, Haven Salon + Spa, Inc. its officers, agents, successors, and assigns, shall take the action set forth in the recommended Order of the Administrative Law Judge.

Dated, Washington, D.C., June 17, 2021.

By direction of the Board:

/s/Farah Qureshi
_____
Deputy Executive Secretary

JD-21-21
Muskego, Wisconsin

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

**HAVEN SALON + SPA, INC.**
      **Respondent**

**and**                                 **Case 18-CA-266091**
                                        **Case 18-CA-267818**

**KATHERINE REHM, an Individual**

Rachael Simon-Miller, Esq. and Jessica Gibson
*Counsel for the Acting General Counsel*

<u>**DECISION**</u>

SHARON LEVINSON STECKLER, ADMINISTRATIVE LAW JUDGE.  Hopefully, in the not too distant future, the COVID-19 pandemic will seem like a bad dream.  Hundreds of thousands of lives have been lost in this country alone and millions of others bear grievous scars of this period.  This case presents some of the difficulties in the workplace during this painful time.

The Consolidated Complaint alleges that Respondent Haven Salon + Spa, Inc.  (Haven) violated Section 8(a)(1) of the Act by removing Charging Party Katherine Rehm (Rehm) from the salon's schedule, and effectively terminating her, after she concerted complained about the salon's COVID procedures.  The complaint also contends that, after Rehm filed unfair labor practice charges, Respondent Haven confirmed that it terminated Rehm and made threats towards her and her family.

Rehm filed her initial charge in Case 18-CA-266091 on September 15, 2020 and a copy was served by regular mail upon Respondent on the same day.  Rehm filed an amended charge in Case 18-CA-266091 on September 21, 2020, which was served upon by regular mail upon Respondent on the same date.  On October 19, 2020, Rehm filed a charge in Case 18-CA-267818, which was served upon Respondent by regular mail on September 21, 2020.

Counsel for the General Counsel issued a Consolidated Complaint and Notice of Hearing on November 24, 2020.  (GC Exh. 1(i).)  Respondent Haven, by its Owner Timothy Dillett, filed

an Answer on December 14, 2020.[1]  Hearing in this matter was held on February 17, 2021 via Zoom videoconference technology.

5                          **COMPLAINT ALLEGATIONS AND RESPONDENT'S ANSWER**

       The consolidated complaint contends Respondent made the following Section 8(a)(1) violations:

10        On July 25, 2020, Tim Dillett prohibited employees from discussing safety
          concerns related to how Respondent operates its business in light of COVID-19
          with anyone but management.  (Complaint ¶5(a))

          On July 25, 2020, Respondent removed Charging Party Rehm from the schedule,
15        effectively terminating her because of her protected concerted activities and
          subsequently confirmed the termination upon receipt of the unfair labor practice
          charge in Case 18-CA-266091.  (Complaint ¶4)

          On September 21, 2020, Tim Dillett impliedly threatened an employee with legal
20        action and/or other unspecified retaliation because the employee filed an unfair
          labor practice charge with the Board.  (Complaint ¶5(b))

          On October 19, 2020, Tim Dillett impliedly threatened an employee and the
          employee's relative with legal action and/or other unspecified retaliation because
25        the employee filed an unfair labor practice charge with the Board.  (Complaint
          ¶5(c))

       Respondent denies that it made any statements that violated the Act, particularly the
comment that on July 25, he meant anything other than protecting an employee's health
information.  Regarding the other alleged threats in response to the unfair labor practice charge,
30  Respondent, by Tim Dillett, maintained that he was frustrated why Rehm took this step to
"financially damage [his] business." (Answer ¶5(b))  Regarding Rehm's termination, Respondent
contended Rehm was never terminated but instead Rehm failed to contact him in mid-August to
schedule shifts; and he was willing to employ her if she contacted Respondent.  Respondent
35  denied that Tim DIllett confirmed her termination and instead maintained that Rehm resigned.
Respondent further maintained, on December 11, that the NLRB effectively terminated Rehm
without Respondent's consent.

---

[1] Although Respondent was tardy in filing its Answer to the Consolidated Complaint, General Counsel
does not move to strike the Answer.  General Counsel also offered to assist Respondent in correcting his
complaint to conform with appropriate confirmations and denials.  (GC Exh. 23.)  The Board has
repeatedly held that admissions in an answer are binding even where the admitting party later attempts to
produce contrary evidence. *C.P. Associates, Inc.*, 336 NLRB 167 (2001); *Consolidated Bus Transit, Inc.*,
350 NLRB 1064, 1065 n. 6 (2007), enfd. 577 F.3d 467 (2d Cir. 2009); and *Lorge School*, 355 NLRB 558,
JD slip op. at n. 3 (2010) (answer to compliance specification).  See *also T. Steele Construction, Inc.*, 351
NLRB 1032 n. 12 (2007) (rejecting respondent's argument that its previous admission in its answer
should be amended to a denial to conform to the evidence presented at trial); and *Boydston Electric, Inc.*,
331 NLRB 1450, 1451 (2000) (holding that the judge erred in finding, based on the evidence at trial, that
the alleged discriminatee was not discharged, in light of the respondent's previous admission to the
discharge in its answer).

I find that General Counsel has carried its burdens of proof and Respondent violated the Act as alleged.

**JURISDICTION[2]**

5

Tim Dillett (Dillett) and wife Carly Dillett own Haven, which is an Aveda salon and spa with locations in New Berlin, Wisconsin and Muskego, Wisconsin. Respondent's Answer did not include an admission or denial of jurisdiction. General Counsel issued subpoenas duces tecum to Haven and owner Tim Dillett. It also issued a subpoena ad testificandum to Dillett on February

10    1, 2021.[3]  Postal records reflect that the subpoenas were refused. I issued a pre-hearing order on February 5, 2021 for the February 17 hearing. The Zoom Order was amended on February 12, 2021 to change the due date and time of the documents until the morning of hearing. (GC Exh. 1(aa).) General Counsel requests that I take adverse inferences from Respondent's failure to comply with the subpoenas. Among the documents that General Counsel subpoenaed was

15    commerce information. Respondent did not provide any documents pursuant to the subpoenas.

Pursuant to *Tropicana Products*, 122 NLRB 121 (1958), the Board will assert jurisdiction as long as statutory jurisdiction is satisfied. That information may be established through secondary evidence. *J.E.L. Painting & Decorating*, 303 NLRB 1029, 1030 (1991), citing *Air*

20    *Control Products*, 132 NLRB 114 (1961). Respondent filed a commerce questionnaire in the course of the investigation, which General Counsel submitted during the hearing. The questionnaire, dated October 18, 2020, demonstrates that Respondent purchased and received goods valued in excess of $50,000 directly from states outside the State of Wisconsin. (GC Exh. 20.) As the subpoenas were properly served and postal documentation establishes Respondent

25    refused service, the Commerce Questionnaire sufficiently establishes that Respondent's operations satisfy the Board's statutory jurisdiction. I therefore find that Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.[4]

Dillett participated in conference calls but declined to engage further on January 28, 2021

30    via email to General Counsel. (GC Exh. 23 at 3.)

35

---

[2] During the pre-hearing process, Respondent suggested that this matter should be tried in a local court rather than through the proscribed administrative process. Respondent initially refused to participate in a pre-hearing conference call and stated that the proceedings should be moved to the Waukesha County, Wisconsin court and the Board was responsible to move to that jurisdiction. (GC Exh. 24.) The National Labor Relations Act pre-empts state and local jurisdiction over cases involving this type of alleged protected concerted activity. See, e.g., *Andrewsikas v. Supreme Industries, Inc.,* 3:19-cv-00574 (JAM) (D.Conn. March 22, 2021) (court grants employer's motion for summary judgment and dismisses plaintiff's case regarding workplace safety and protected concerted activity because the case was preempted by the NLRA) and cases cited therein; *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236 (1959).
[3] See, e.g.: subpoena duces tecum B-1-1BLJB0D, issued on February 2, 2021 to Timothy Dillett and/or Custodian of Records at Haven; subpoena A-1-1BL3PJ1, issued on February 1, 2021, to Timothy Dillett at Haven's Muskego location (GC Exhs. 1(m)-(o)).
[4] Also see *Valentine Painting and Wallcovering, Inc.*, 331 NLRB 883 (2000).

## FACTS

### I.    HAVEN OPERATIONS AND CHARGING PARTY REHM

5    Haven operates two salon/spas, one in Muskego, Wisconsin and a newer, smaller operation in New Berlin, Wisconsin.  (Tr. 18.)  During the summer of 2020, Haven employed approximately 30 – 40 persons.  (Tr. 19.)

Charging Party Katherine Rehm was employed at Haven from 2018 until the end of July
10    2020.  She had a previous period of employment from October 2014 until 2018, when she left to perform contract work elsewhere.  She was rehired by Carley Dillett.  Rehm reported to Haven co-owner, Timothy Dillett.  (Tr. 17.)

Rehm worked as a guest concierge at both salon locations.  She typically checked in
15    guests when they arrived, showed guests to their services, scheduled appointments, sold products and answered telephones.  If she opened the salon, she prepared for the day's business, which entailed balancing the cash drawer, ensuring stations had necessary supplies, preparing a beverage station and starting laundry.  (Tr. 16-17.)  In February 2020,[5] Rehm was assigned additional duties as the communications lead person.  Despite this change in duties, Rehm did
20    not have a Haven work email address until May 15.  (Tr. 27.)

### II.    REHM DIRECTLY DISCUSSES COVID-19 SAFETY PROTOCOLS WITH OWNER TIM DILLETT

In mid-March, Owner Tim Dillett notified the employees that Haven was closing due to the
25    state-wide order to stay at home due to the COVID-19 pandemic.  On May 11, he notified employees via email that Haven was reopening on May 26.  Dillett announced some precautions: a separate group of employees would answer the phones so that the guest concierges could assist with sanitation between guests; touchless pay systems; and his determination that the Center for Disease Control's (CDC) recommendation that plexiglass shields was unnecessary
30    and interfered with the guest experience.  (Tr. 21-22; GC Exh. 2.)

On May 14, Tim Dillett sent employees another email with his determination that Haven would reopen on May 18.  (Tr. 22-23; GC Exh. 3.)  Rehm was not secure with Haven's COVID safety plans, so she researched what COVID protocols other Aveda salons had in place.  Once
35    found, Rehm emailed one such salon's plans to Tim Dillett on May 15.  Particularly at issue was Haven's mask protocol.  Rehm stated that she would wear a mask  out of concern for others and would want guests to do the same.  (Tr. 24-25; GC Exh. 4.)  Tim Dillett, responding by email on the same day, stated that it could be discussed at a Zoom meeting the next day, but masks were a touchy subject; Haven would supply two masks to all employees and recommend that
40    employees wear them.  (GC Exh. 4.)

On Sunday, May 17, Tim Dillett emailed documents about COVID safety procedures and policies.  Among the policies was a determination that guests were recommended, but not required, to wear masks.  Certain services required employees to wear masks, while others were
45    recommended.[6]  (GC Exh. 10.)  During that weekend before the reopening, Rehm, with two other front desk employees, prepared the New Berlin salon.  The employees had only 2 days in which to prepare the salon, including time to call customers for scheduling.  In their discussions, the

---

[5] The dates for the remainder of the facts occur in 2020 unless otherwise stated.
[6] Haven also installed an air purification system.

employees noted that did not have enough hand sanitizers and other cleaning equipment.  They also discussed the confusion that the mask policies created.

On May 18, Haven opened as scheduled.  As Dillett directed, Rehm was supposed to wipe
5    down the chairs and shampoo bowls after each customer, using a solution of dish soap and hot water.  Whenever a guest was in an area and left, Rehm was supposed to sanitize handles, countertops, iPads, and furniture with rubbing alcohol.  (Tr. 31-32.)  Despites these directions, Haven did not provide the supplies to accomplish these goals.  (Tr. 32.)  Many of the staff did not wear their masks and the salon was not marked for social distancing.  (Tr. 33.)  Rehm and
10   employee Billie Lyon, an esthetician at Haven's Muskego location, had ongoing discussions about these safety concerns from possible COVID exposure.  (Tr. 34.)  Rehm and Lyon wore their masks consistently, while other employees did not.  (Tr. 85-86.)

Rehm also discussed concerns about lack of supplies with Shannon Traeger, another
15   New Berlin front desk employee.  (Tr. 35.)    Rehm and a hair stylist at the New Berlin location, Reannon Hopkins, discussed the confusing and unenforceable mask policy and lack of appropriate spacing, e.g., 6 feet, between stylists' chairs.  (Tr. 36-37.)

About a week or two after Haven's reopening, Rehm conversed with Tim Dillett at the
20   Muskego front desk about the safety issues.  Rehm told him that they needed more sanitizing supplies and that the touchless credit card readers were not working, causing contacts through manually running the credit card after taking the card from the salon guest.  (Tr. 38.)  Tim Dillett said he did not know why the touchless payment system was not working but would look into the matter.  Rehm also suggested marking the floor to indicate social distancing, particularly since no
25   partitions were at the front desk.  Tim Dillett told Rehm he would give some thought to her ideas. (Tr. 39.)  She also raised the confusion about masks and he said he might add something to the booking process. (Tr. 40.)

Approximately one month after Haven's reopening, at the New Berlin location, Rehm again
30   conversed in person with Tim Dillett about the lack of sanitizing supplies, marking the floor for social distancing, occasional problems with the touchless credit card system, and masking.  Tim Dillett said he would look for more sanitizing supplies, look into the touchless credit card system, and her request to mark the floor.  (Tr. 41-42.)  Nothing changed despite Rehm's conversations with Tim Dillett.
35

III.    COVID-19 STRIKES THE HAVEN SALON, CAUSING CONCERNS AMONG EMPLOYEES

While working on Thursday, July 23, Rehm noticed that a stylist's appointments were
40   transferred to another stylist, which indicated to Rehm that the stylist was sick.  Rehm asked another employee to confirm whether the stylist was sick. That employee told Rehm that the stylist was getting tested for COVID.  (Tr. 42-43.)

On Friday, July 24, during an in-person conversation with Tim Dillett at the Muskego salon,
45   Rehm asked Dillett about the stylist whose appointments were transferred and that COVID testing was mentioned.  Rehm asked if the staff would be informed if the stylist's COVID test was positive. He also told Rehm that no one need worry ---- everyone was "extra safe."  (Tr. 43-44.)  Later that same day, at the front desk, Rehm conversed with esthetician Lyon while 2 other employees were present.  Rehm and Lyon discussed if they might be informed of the stylist's positive COVID test. The other employees had not heard about the possibility of COVID and all of them had worked
50   with her.  (Tr. 45.)  Rehm knew this stylist did not wear masks at work.

After Rehm left work, at 3:46 p.m., Dillett sent to all Haven employees an email about the stylist's condition. The email stated the stylist tested positive, was asymptomatic, and he was checking the time of exposure; the employee would not return to work until a healthcare professional cleared her. (Tr. 46-47, 88-89; GC Exh. 5.)

5

Rehm reviewed the email and was concerned because she worked with the stylist on Monday and Wednesday of the week in which the stylist tested positive. The email gave no indication of whether employees needed testing, sanitation was needed or if the salon would close. She had an additional concern because she was on her way to pick up her children. She ultimately obtained a doctor's opinion[7] that she should get tested and her children should not go with her. (Tr. 47-48.)

10

IV.    AFTER OWNER TIM DILLETT INFORMS EMPLOYEES ABOUT THE COVID CASE, REHM HITS THE "REPLY ALL" ON AN EMAIL TO EXPRESS HER SAFETY CONCERNS TO ALL EMPLOYEES

15

In the meantime, at 3:54 p.m., Rehm and Lyon communicated about the situation via text message. Lyon pointed out that she worked with on Wednesday the infected stylist and one does not get exposed on one day and test positive on the next day. Rehm expressed that she did not feel safe going to work. Lyon informed Rehm that she emailed Tim Dillett that she worked with the infected stylist two days before and she needed to have some time off for testing. (Tr. 48-49, 89-90; GC Exhs. 6, 17.) Dillett responded to Lyon at 4:54 p.m. and said the infected stylist was not in contact with the individual who tested positive on Wednesday night and was tested the following day. He told her not to test unless she had symptoms.

20

Rehm confirmed, based upon the doctor's information, Lyon's concern that someone would not test positive if exposed on a few days before the test. Rehm said she would get tested the following day. Rehm and Lyon talked about all the guests who potentially were exposed and Haven's failure to notify them. Lyon decided to get tested the next day and would not return to work until she had her test results. (GC Exh. 6.)

25

30

At 5:13 p.m. July 24, Rehm replied to Dillett's email with the "respond all" function, with all employees receiving the email. Rehm wanted to ensure that all employees received the same information from Rehm that she did. (Tr. 54.) In the email Rehm stated:

35

> I sincerely hope the employee is feeling ok and ends up with a very mild case.

> I can only speak for myself, but it makes me very uncomfortable to come back to work as is at the moment. Unless the employee hasn't been in the salon for the past ten days, I'm not sure how the risk of exposure to the remaining staff/guests can be discounted? It doesn't feel safe to just assume no one else could have been exposed. I truly hope that to be the case, but I'm not confident simply assuming. It concerns me for both the Haven team, as well as our guests.

40

45

---

[7] This information is consistent with Center for Disease Control findings in March through May 2020: COVID incubation was as long as 14 days, with a "median time of 4-5 days from exposure to symptoms onset." See: Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html and footnotes therein (updates as of February 16, 2021).

I've already talked to my doctor and will be getting tested tomorrow.

(GC Exh. 5.)

5          Nothing in Rehm's email to Dillett and the other employees indicated Rehm was refusing to work or asking to be removed from the scheduled. (Tr. 54.) On Saturday, July 25, 8:20 a.m., Lyon texted Rehm that Lyon was getting tested. Rehm texted that the Muskego salon employees were scheduled to perform services that same day on a wedding party and all those employees had contact with the infected stylist. Rehm had checked through the scheduling software on 10 morning of July 25, which indicated the wedding party was not canceled. (Tr. 59.) She was amazed that the Dilletts were conducting Haven business as usual. (GC Exh. 19.)

V.    ON JULY 25, HAVEN CANCELLED ALL OF REHM'S SHIFTS AND THEN HER FUTURE SALON APPOINTMENTS

15

          Lyon told Rehm she was concerned that she potentially exposed an older guest to COVID during a facial. Rehm tried to log into the scheduling software that had been using up until this time. She logged out but could not log back in, which was unusual. While Rehm was in line for her testing, Lyon and Rehm continued to communicate and Rehm mused about Tim Dillett 20 possibly removing her scheduling software access. (Tr. 58-59; GC Exh. 19 at 7.) Rehm sent to Tim Dillett an email telling him about information from the testing center—that the infected stylist would have had exposure at least 3 days before a positive test. She copied the text, which Rehm sent at 12:56 p.m., and sent it to Lyon. (Tr. 58-59; GC Exh. 7 at 8; GC Exh. 11.)

25          At 1:26 p.m. July 25, Tim Dillett sent to Rehm an email:

          . . . I respect your opinion, and the other concerns you shared with the entire staff.

          You should know, that actions on my end are being taken to follow up and 30          continuously review every decision I make, so it is in the best interest of all employees and guests.

          Just because I say something, doesn't mean I'm not doing work in the background. HIPAA [sic] is also a big concern of mine.
35
          COVID-19 is a very sensitive topic, where concerns should be discussed one on one, especially as it related to doing business during this very difficult time.

          Specifically, as it related to the concerns in your email, here are the steps I have 40          taken:

          It works out well that we have a new hire starting on Tuesday, who will take your shifts this upcoming week.

45          In addition, per your request/concerns, I have changed the August schedule.

          As we approach mid-August, if you'd like, we can sit down one on one to discuss and review September, based on how you feel, at that time.

50          I will look for you to reach out based on your comfort level returning to work.

7

And at that time, we can review any shift needs in September.

(GC Exh. 7 at 1.)

5    At 8:23 p.m., Rehm responded via email:

As a dedicated employee of Haven for several years, I wanted to share my concerns with you (and the rest of the team) in a respectful manner; and I believe I did that. My response wasn't meant to offend in any way, but rather to express

10    my genuine concern with regards to the possibility of exposure for all of us. . . . If there's a chance I could have contracted COVID-19s through exposure, I simply wanted to be proactive in my approach over the next few days.

Rehm advised Dillett she was in contact with her doctor and told him that she made no statement

15    about returning to work or refusing to work or "abandoning [her] role." Rehm asked to discuss the schedule changes with Dillett and said she would look at unemployment in the meantime. Tim Dillett did not respond. (GC Exh. 7)

An esthetician, Katie Rose, reached out to Rehm at 9:44 p.m. on July 25. Rose asked if

20    Rehm was tested and when she would get results back. Rehm told Rose she was removed from the schedule and her software access was removed. Rehm also explained that she hit the "reply all" to Dillett's group email because Dillett was not provide accurate information regarding COVID exposure. (GC Exh. 13.)

25    In the meantime, Lyon emailed Tim Dillett. Lyon said she worked with the infected employee and told Dillett she needed to take off July 25 until she had a COVID test that was negative. She advised Dillett that she had no scheduled appointments. Dillett, responding on the evening of July 25, asked Lyons for an estimate of when she would receive her test results and adjusted her appointment schedule. After her test, Lyon advised it would be 2 or 3 days but would

30    tell Dillett as soon as she had her results. (GC Exh. 17.)

Rehm kept a list of her upcoming shifts and checked activity at the salon on the morning of July 25. Haven cancelled all of Rehm's shifts through August 26; apparently none had been scheduled after August 26.

35

In addition to cancelling Rehm's shifts, Haven apparently cancelled Rehm's scheduled salon services for hair and waxing for the remainder of the year. A few days before scheduled services on July 29, Rehm called the front desk to cancel because she did not have her COVID test results. The lead front desk concierge texted her that she had no appointment on the books

40    for July 29. Rehm asked if any upcoming appointments remained in the schedule. None of her scheduled services remained on the books. (Compare GC Exh. 9 and GC Exh. 18.) Rehm received at least a 50 percent employee discount on Haven's services. (Tr. 72.) Rehm's picture was removed from Haven's website approximately 1 week after the July 25 email exchange between Rehm and Tim Dillett.

45

On Monday, July 27, Lyon found out that her COVID test was negative and relayed that information to Tim Dillett per email. Tim Dillett emailed back that he removed the block on Lyon's scheduling effective the next day and he would see her then. (Tr. 98-99; GC Exh. 17.)

50    Lyon later discussed with another employee that Rehm was removed from the schedule. About a week after her return from COVID testing, Lyon also asked her salon manager, Erica

Chonacki,[8] why Rehm was no longer on the schedule.  Manager Chonacki told Lyon that, although she had not spoken with Dillett and did not know the reason, she knew trouble was ahead when Rehm sent the email with a "reply all" and it disagreed with the Dilletts.  Chonacki further stated that someone in the past had sent a "reply all" email in disagreement with Dillett and the person was in trouble for doing so.  (Tr. 104-106.)

VI.    IN EMAILS, OWNER DILLETT THREATENS REHM AFTER SHE FILED ULP CHARGES AND CONFIRMS HAVEN DISCHARGED REHM

On September 15, Rehm filed the initial charge in Case 18-CA-266091.  On Monday September 21, Tim Dillett emailed Rehm:

. . . It is actions like the one you just took, that makes us, as small business owners, wonder if it's really worth it.

From a person who gave you a second chance, I am disgusted by the action you have decided to take.

If you only had a clue what Carley and I have been through this year.

I hope you feel good about it.

I personally feel you should be ashamed of yourself.

Good luck with it,

I am clocking my hours, FYI.

Tim

(GC Exh. 14.)  Rehm believed that Dillett's reference to a second chance was Respondent rehiring her after her break in employment.  (Tr. 75-76.)

Respondent's Answer states, "Once I got the NLRB charge, I considered that [Rehm's] resignation; I considered her an employee up until then."  He further stated " . . . the NLRB has taken the step to termination Ms. Rehm from Haven Salon + Day Spa, Inc. . . . ."  (GC Exh. 1(k), at 4.)

In October, Rehm notified the Occupational Safety and Health Administration (OSHA) about events at Haven and her safety concerns.  (Tr. 78.)  On October 19, Dillett again emailed Rehm and referenced her college-age son, Parker, who worked at Haven during school breaks:

Everything is going really well so far with this case.

Thank you for submitting it.  It's teaching me more about why small businesses fail.

---

[8] Chonacki could make schedule changes and grant time off requests.  (Tr. 104.)  Because Chonacki exhibited apparent authority, I consider that she is at least an agent per Section 2(13) of the Act.

In addition, I did want to ask if you knew anything about the events that occurred at the end of May in New Berlin? This involved something Parker did with his phone camera on his last day of work.

5      To me, it personally disgusted me and the more I've thought about it, sexual harassment is the word for it.

The lack of respect these kids have today I guess they say comes from their parents.

10      That is why I'm taking the time to tell you, as his Mother.

I'm working on next steps as it relates to that and I'm glad everything was documented.

15      You should ask him about it because you're probably going to want to know more when it surfaces soon.

Or it may not, but that all depends.

20      Have a great day,

Tim

25   (GC Exh. 15.)

After the Region issued complaint on November 24 and before Haven filed its Answer, Dillett emailed Rehm about the Haven's pending unfair labor case on December 10. Dillett offered to put Rehm back on the schedule. He further stated:

30      Furthermore, as you are aware, the schedule management of the front desk is entirely different than that of a service provider. While a service provide can be scheduled off, it doesn't compromise the entire operation of the business. This is exactly why I made the decision to remove you from the schedule while putting the ownership on you to reach out to get back on the schedule when the complete monthly schedule is drafted.

35

(GC Exh. 1(k) at p. 2.)

40   Haven's Answer also contends that his July 25 email to Rehm was misinterpreted because he was trying to maintain an employee's confidentiality, not discourage protected concerted activity. Id. He later contended that the NLRB has taken the step to terminate Rehm. Id. at pages 4 and 7. The Answer also contends that a termination notice would have been evidence of her termination. Id. at 4. The Answer also states, " . . . Rehm's only intention for initiating this charge through the NLRB, was to inflict financial damages on Haven Salon + Day Spa Inc., while receiving financial gain." Id. at p. 7.[9]

45

_____

[9] The Answer also states that as of December 11, Dillett gave Rehm a deadline to respond to getting back on the schedule until December 14. If she did not respond, Rehm is terminated on December 15 for refusing to work for five consecutive months." (GC Exh. 1(k) at p. 7.)

**ALLEGED UNFAIR LABOR PRACTICES**

     The consolidated complaint alleges violations of Section 8(a)(1) as independent threats and Rehm's removal from the schedule and her termination.  I first discuss whether the three
5    email statements constituted threats.  I then discuss whether Rehm was terminated.  Finding that Rehm was terminated on July 25, I discuss whether Haven's termination of Rehm was due to protected concerted activity.

I.       ALLEGED SECTION 8(A)(1) STATEMENTS[10]

10

     A.  Applicable Law

     Statements that have a reasonable tendency to interfere, restrain or coerce employees in the exercise of their Section 7 rights, when taken in context, violate Section 8(a)(1*). Cascades
15    Containerboard Packaging—Niagra, A Division of Cascades Holding US Inc.,* 370 NLRB No. 76 (2021).  These statements are assessed in the context in which they are made and whether they tend to coerce a reasonable employee. *Westwood Health Care Center*, 330 NLRB 935, 940 fn. 17 (2000). The standard for assessing alleged 8(a)(1) threats is objective, not subjective. *Multi-Add Services*, 331 NLRB 1226, 1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001). Any subjective
20    interpretation from an employee is not of any value to this analysis. *Miami Systems Corp.*, 320 NLRB 71, 71 fn. 4 (1995), affd. in relevant part 111 F.3d 1284 (6th Cir. 1997).  Threats of reprisals for engaging in protected concerted activities are coercive.  *Castro Valley Animal Hospital, Inc.*, 370 NLRB No. 80, slip op. at 17 (2021) and cites therein.

25     B.  Dillett's Emailed Statements Violated Section 8(a)(1)

     1.  Tim Dillett's July 25 email to Rehm

     On July 25, Tim Dillett emailed employee Rehm:  "COVID-19 is a very sensitive topic,
30    where concerns should be discussed one on one, especially as it related to doing business during this very difficult time."  Dillett mandated Rehm to only discuss this issue with him, which precludes Rehm from discuss matters with other employees as a group. In *Pepper Packing Co.*, 243 NLRB 215, 220 (1979), an employer warned an employee to keep his mouth shut in a safety meeting. The employer maintained it wanted to shorten the meeting and then, in the course of the meeting,
35    twice told the employee to be quiet. The employer's motivation was of no consequence and the Board affirmed the administrative law judge's determination the employer violated Section 8(a)(1). Id. at 223-224.  Similarly, Haven's instruction therefore prohibits protected concerted activity, demonstrating coercion in violation of Section 8(a)(1) of the Act.  *Marburn Academy, Inc.*, 368 NLRB No. 38 (2019) and cases cited therein.

40

     2.  Tim Dillett's September 21 email to Rehm

     Six days after Rehm filed her initial charge, Dillett sent the September 21 email.   He says he does not know how she sleeps at night and at the end states he is "clocking" his hours.
45    Employees retain an "unfettered right" to access Board proceedings and be free from threats and intimidation from their employer.  *Deep Distributors of Greater NY d/b/a the Imperial Sales, Inc.*, 365 NLRB No. 95, slip op. at 20 (2017), enfd. 740 Fed. Appx. 216 (2d Cir. 2018).

---

[10] Analysis of credibility here is not necessary as the statements were made in emails, which Rehm properly authenticated.  The authentication process included identification of Tim Dillett's email address.

General Counsel correctly cites *Carborundum Material Corp.*, 286 NLRB 1321, 1321-1322 (1987). There the Board found that a supervisor threatened an employee with legal action because the employee filed a Board charge. Id. Objectively analyzing Dillett's email, I find that
5   Dillett impliedly threatened Rehm. Dillett's comments about difficulty running the business may be protected by Section 8(c) of the Act as opinion. The particular problem is that Dillett states he is "clocking his hours," impliedly threatening Rehm with some sort of retribution in the form of paying for those hours. The statement is coercive and violates Section 8(a)(1). Id.; *United States Postal Service*, 350 NLRB 125, 126 (2007) (threat regarding Board charge is not entitled to immunity because not preliminary to or intertwined with protected litigation or petitioning activity),
10   reconsideration denied 351 NLRB 205 (2007), enfd. 526 F.3d 729 (11th Cir. 2008).

### 3. Tim Dillett's October 19 email to Rehm

In his October 19 email, Owner Dillett states he might or might not go forward with action
15   regarding Rehm's son, who worked at Haven before returning to his studies. Five months after alleged sexual harassment occurred, Dillett suddenly raises the allegation to Rehm. Dilllett implies that some sort of action, such as legal action, could be taken depending on what Rehm does. Threats of legal action for participating in Board activities are unlawful. See generally *Deep Distributors of Greater NY*, 365 NLRB No. 95, slip op. at 20. This statement, in relationship to the
20   Board charge, is tantamount to a threat of blackmail, which is unlawful. *Water Jack and Dixie A. Macy d/b/a 7-Eleven Food Store*, 257 NLRB 108, 114 (1981) (employer statement that an employee who was a union adherent would be "taken care of" was like blackmail).

II.   ALLEGED TERMINATION FOR PROTECTED CONCERTED ACTIVITY[11]

25

A.   Applicable Law

Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed
30   in Section 7 [of the Act]." Section 7, the cornerstone of the Act, provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Employees have a statutory right under Section 7 to act together "to improve terms and conditions
35   of employment or otherwise improve their lot as employees." *Valley Hospital Medical Center*, 351 NLRB 1250, 1252 (2007), enfd. 358 Fed. Appx. 783 (9th Cir. 2009). Similarly, an employer violates the Act if terminates an employee to prevent an employee from engaging in protected concerted activities. *Cordua Restaurant, Inc. v. NLRB*, 985 F.3d 415,423 (5th Cir. 2021), rev. den and affg. 366 NLRB No. 72 (2018), supplemented by 368 NLRB No. 43 (2019).

40

The Act accordingly prohibits employers from discharging employees for exercising their rights to engage in concerted activities for the purpose of mutual aid or protection. See *MCPC Inc. v. NLRB*, 813 F.3d 475, 479 (3rd Cir. 2016), affg. in rel. part 360 NLRB 216 (2014). An employer also violates the Act when it discharges an employee it believes engaged in protected
45   concerted activity. *Lou's Transport, Inc.*, 361 NLRB 1446, 1447 (2014), rev. den. 644 Fed Appx. 590 (6th Cir. 2016).

---

[11] I fully credit the testimonies of Rehm and Lyon. Most of the testimony was corroborated with email and/or text message exchanges. Neither displayed any hesitancy in testifying, even when I was asking the questions.

I first must determine whether Rehm was discharged on July 25, as stated in the complaint. The next step determines whether Rehm engaged in protected concerted activity. Finding that she was, I further find that Respondent's motivation is not in question and therefore the appropriate test is found in *Burnip & Sims*, supra. See *Shamrock Foods*, 337 NLRB at 915. However, Acting General Counsel contends that the case involves Respondent's mixed motive for termination and uses that analysis. I will provide the mixed motive analysis in an abundance of caution. In both analyses, I find Respondent Haven violated Section 8(a)(1).

B. Respondent Terminated Rehm on July 25

Haven maintains Rehm was not terminated, especially without a termination notice, and her actions caused her to be considered a resignation. In examining this issue, one need not require a specific statement of termination to create a termination. *Castro Valley Animal Hospital*, 370 NLRB No. 80, slip op. at 15, citing *Lance Investigation Service*, 338 NLRB 1109, 1110 (2003) and *North American Dismantling Corp.*, 331 NLRB 1447 (2000), enfd. in rel. part 35 Fed. Appx. 132 (6th Cir. 2002).

The standard for review of such a situation is an objective one. *Bates Paving & Sealing, Inc.*, 365 NLRB No. 46, slip op. at 2 (2016). The test is whether the employer's actions or words "would logically lead a prudent person to believe her [or her] tenure has been terminated." *Castro Valley Animal Hospital*, 370 NLRB No. 80, slip op. at 15 (internal quotes and cites omitted). Also see *Noah's Ark Processors, LLC d/b/a WR Reserve*, 370 NLRB No. 74 fn. 6 (2021).

First, Haven made its determination to remove Rehm from her shifts without advising her about it. Rehm had to approach Dillett and ask what happened. Then, as in *Castro Valley*, supra at 15, Haven owner Tim Dillett informed Rehm he already had someone to replace her shifts. Dillett advised Rehm to call to see if she could be scheduled, but he made no concrete promises to have her on the schedule. Rehm did not state that she was unequivocally refusing to work and did not ask for any time off. See generally *Accurate Tool & Mfg., Inc. d/b/a Accurate Wire Harness*, 335 NLRB 1096, 1096 (2001), enfd. 86 Fed. Appx. 815 (6th Cir. 2003).

Dillett's July 25 message was clear: Because Haven removed Rehm from the schedule without any discussion with her, replaced her and its offer to give her some shifts was not much of an offer to return, Rehm correctly understood that she was terminated.

The Board points out strong rationale to support why this situation is a termination. *Bates Paving*, supra, slip op. at 2. In addition to finding that discharge constitutes "capital punishment" for employees, The Board further states that an employer cannot simply reverse a termination before an employee endures financial hazards, in order to avoid a Board finding. The Board further states:

> The message has been sent that the employer is willing to take this extreme action and the employee victim is likely to understand that a "change of heart" may not come so quickly, if at all, if he again engages in protected concerted activity.

*Bates Paving*, 364 NLRB No. 46, slip op. at 2.

Haven apparently took additional steps that reflect Rehm's discharge. Within a week, Respondent removed from its website Rehm's picture, which previously reflected her status as an employee. Another indication that Respondent did not want Rehm back to work or on its premises is its unilateral cancellation for Rehm's scheduled personal services, which was

elimination of an employee benefit.  The deletion of services for July 29 through the end of 2020 reflects Respondent's desire not to provide any services to Rehm or give her a reason to access the Haven salons.  It also shows Respondent did not expect to provide this benefit to Rehm at any time in the future.  These facts would lead a reasonable person to logically believe that she had been terminated.

Additionally, the evidence does not support that Rehm abandoned her job.  Her email only stated she was going to get tested on Saturday.  It did not include a refusal to work and Dillett did nothing to ascertain what Rehm meant before he removed her from the schedule.  See generally *Atlantic Scaffolding Co.*, 356 NLRB 835, 838 (2011).[12]

I therefore find that Haven, through Dillett's July 25 email, confirmed it already terminated Rehm.  *Bates Paving*, supra.

C.  Rehm Engaged in Protected Concerted Activity

The first determination is whether an employee engaged in protected concerted activity. If the conduct was concerted, then the analysis shifts to whether the conduct was protected. An employee's conduct must be both "concerted" and for the purpose of "mutual aid or protection" for it to be protected under Section 7 of the Act. *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 153 (2014). The Supreme Court, however, has held that Congress did not intend to limit the protection of Section 7 of the Act to situations "in which an employee's activity and that of his fellow employees combine with one another in any particular way." *NLRB v. City Disposal Systems*, 465 U.S. 822, 835 (1984). The Supreme Court has recognized that the concept of "mutual aid or protection" concerns "...the goal of concerted activity; chiefly, whether the employee or employees involved are seeking to 'improve terms and conditions of employment or otherwise improve their lot as employees.'" *Fresh & Easy Neighborhood Market*, supra at 153, citing *Eastex*, supra at 565. The "concertedness" and "mutual aid or protection" elements under Section 7 are analyzed under an objective standard, whereby motive for taking the action is not relevant to whether it was concerted, nor is motive relevant to whether it was for "mutual aid or protection." *Fresh & Easy Neighborhood Market*, supra, at 153. Employees may act in a concerted fashion for any number of reasons, some of which are altruistic and others selfish. *Castro Valley Animal Clinic, Inc.,* 370 NLRB No. 80, slip op. at 13-14 (2021), *citing Fresh & Easy Neighborhood Market*, supra, at 154.  The analysis instead focuses on " . . . whether there is a link between the activity and matters concerning the workplace or employees' interests as employees." *Fresh & Easy Neighborhood Market*, supra.

1.  Concerted activity

The analysis for concerted activity is an objective standard based upon the totality of the circumstances.  *Castro Valley Animal Hospital*, 370 NLRB No. 80, slip op. at 12.  Activity is "concerted" if it is engaged in with or on behalf of other employees and not solely by and on behalf of the employee himself or herself. The activity of a single employee may be concerted if it seeks "to initiate or induce or to prepare for group action" or brings "truly group complaints to the attention of management." *Marburn Academy Inc.*, 368 NLRB No. 38, slip op. at 10, citing numerous authorities. See also *Alstate Maintenance, LLC*, 367 NLRB No. 68, slip op. 8 (2019)

---

[12] Respondent sent the December emails to Rehm long after her termination and after complaint issued. Those emails allegedly offered Rehm a position to call and schedule hours.  Notably, the emails do not promise a full reinstatement.  (See Respondent's Answer.)   The issue of whether Rehm mitigated damages is an issue for the compliance phase, not in this proceeding.

(even if concerted, for it to be protected, the employee's activity must also be for the purpose of "mutual aid and protection."). The concerted element also must show that the statement looks forward to group action and is not "mere griping." *Castro Valley Animal Hospital*, supra. It must seek to improve the employee's "lot." *Eastex Inc. v. NLRB*, 437 U.S. 556, 567 (1979).

5

When an employee speaks out to a group about workplace concerns, she is engaged in protected concerted activity. *Parkview Lounge, LLC d/b/a Ascent Lounge*, 366 NLRB No. 71, slip op. at (2018), enfd. 790 Fed. Appx. 256 (2d Cir. 2019). A complaint made on behalf of self also constitutes protected concerted activity when the complaint's effect is to improve working

10   conditions for all employees. *Wal-Mart Stores, Inc.* 341 NLRB 796, 804 fn. 9 (2004), enfd. 137 Fed. Appx. 360 (D.C. Cir. 2005), citing *Hanson Chevrole*t, 237 NLRB 584 (1978). This right includes employees' use of "social media to communicate with each other and with the public for that purpose." *Triple Play Sports Bar & Grille*, 361 NLRB 308 (2014), aff'd 629 Fed. Appx. 33 (2d Cir. 2015).

15

Before Rehm sent the "reply all" email, she already spoke with other employees about the safety conditions at Haven. These discussions are concerted. See generally, *Hahner, Foreman & Harness, Inc.*, 343 NLRB 1423, 1424 (2004).

20   Rehm's "reply all" email states, in relevant part:

I can only speak for myself, but it makes me very uncomfortable to come back to work as is at the moment. Unless the employee hasn't been in the salon for the past ten days, I'm not sure how the risk of exposure to the remaining
25   staff/guests can be discounted? It doesn't feel safe to just assume no one else could have been exposed. I truly hope that to be the case, but I'm not confident simply assuming. It concerns me for both the Haven team, as well as our guests.

Although Rehm begins the paragraph with the phrase "I can only speak for myself . . .," she
30   proceeds to discuss whether employees and guests might have been exposed to the virus and invokes the issue of safety about exposure to employees. By stating that she feels uncomfortable to work "as is" as part of this conversation, she is reaching out to other employees. She concludes with applying those ideas not only to the guests, but to the Haven Salon employees, who are included in the email. *Marburn Academy, Inc.*, 368 NLRB No. 38 (2019) (concertedness does not
35   depend upon agreement or shared objective with the coworkers for the proposed action).

Sending the email to the other employees constitutes concerted activity. *Timekeeping Systems, Inc.*, 323 NLRB 244, 244 (1997). Dilllet's July 25 email first recognizes that Rehm contacted the other employees under the guise of respecting her rights, although he later
40   undermines it with his one-on-one discussion requirement. Rehm raises with other employees whether the work environment is safe, including challenging the assumptions Haven and Dillett made in his email. As Rehm reaches out to other employees about a significant working condition during the pandemic and endeavors to improve these conditions for all employees, her activity is concerted. *Pruitthealth Veteran Services – North Carolina, Inc.*, 369 NLRB No. 22, slip op. at 16
45   (2020) (protected concerted activity includes the lone employee who is acting alone to initiate group action); *Wal-Mart*, supra. Based upon the totality of the circumstances, Rehm engaged in concerted activity.

50

2.     Protected subject matter of the conduct

Rehm sought to improve the safety of her coworkers in light of potential exposure to a potentially deadly virus.  In the email to other employees, Rehm cited certain safety issues with the COVID practices at the salons that might endanger the health and well-being of employees.  Concerns such as these are classified with workplace safety hazards, which are "a fundamental matter of concern to employees and are, on that basis, inherently protected."  *Lou's Transport, Inc.*, 361 NLRB 1446, 1456 (2014),[13] rev. denied 644 Fed. Appx. 690 (6th Cir. 2016).  Also see *Matsu Corp. d/b/a Matsu Sushi Restaurant*, 368 NLRB No. 16, slip op. at 1 fn. 2 (2019), enfd. 619 Fed.Appx. 56 (2d Cir. 2020).

Even if Rehm was not actually engaged in protected concerted activity, Respondent Haven believed she was.  *Lou's Transport*, 361 NLRB at 1447.  In *Lou's Transport*, the Board found that an employer believed an employee's displayed signs in the employee's truck were concerted.  Evidence supporting the Board's conclusion was that the employer believed the signs "'stirr[ed] up the crowd.'"  Id.  This evidence demonstrated that the employer "regarded [the employee's] signs as protected, concerted activity."  Id.  Similarly, Dillett believed Rehm should not have addressed her concerns to the entire group and claimed had had to be concerned about protecting health information of a coworker; however, Rehm's email to the group was a "reply all" to Dillett's email on the same subject.  Rehm did not release the name of the individual or additional health information.  Rehm did not engage in any misconduct.

D.     The *Burnip & Sims*[14] analysis

This test applies when the exact conduct for which an employee is disciplined is the protected concerted activity.  I rely on the *Burnip & Sims* test because Haven provides no other reason for removal from the schedule other than Rehm's email to other employees about safety concerns.  *Matsu Sushi Restaurant*, 368 NLRB No. 16, slip op. at 1 fn. 2, citing *CGLM, Inc.* 350 NLRB 974, 974 fn. 2 (2007) and *Bon Harbor Nursing & Rehabilitation Center*, 348 NLRB 1062, 1062 (2006).

The test for the lawfulness of Rehm's discharge has three prongs: An employee is engaged in protected activity; the basis of the alleged act of misconduct occurred during the protected activity; and the employee was not, in fact, guilty of misconduct. *Nestlé USA, Inc.*, 370 NLRB No. 53, slip op. at 1 fn.2 (2021), citing *Burnip & Sims*, 379 U.S. at 23; *In re Shamrock Foods Co.*, 337 NLRB 915, 915 and 924-925 (2002), enfd. 346 F.3d 1130, rehg. denied (D.C. Cir. 2003).  Because Rehm was engaged in protected concerted activity or Haven believed her to be engaged in protected concerted activity, the last two prongs are examined.

The alleged misconduct took place is Rehm's email to other employees, expressing safety concerns.  Dillett's email to Rehm states that she should have had a one on one discussion because of the sensitive nature of COVID-19 and his alleged concern for maintaining protected health information (e.g., the reference to HIPAA).  Dillett neatly segues into what he intends to do about it, namely removing her from the schedule for August, replacing her with a new hire for at least the remainder of July, and seeing if Haven might schedule her for shifts in September.  Respondent's adverse actions,  which constitute termination, are directly linked to Rehm's email to all employees.  *In re SAIA Motor Freight Line, Inc.*, 333 NLRB 784, 785 (2001).

---

[13] Citing, inter alia, *St. Bernard Hospital & Health Care Center*, 360 NLRB 53, 61 (2013).
[14] 379 U.S. 21 (1964).

The employer retains the burden of showing it held an honest belief that the employee engaged in serious misconduct while engaging in protected activity. *In re Kiewit Power Constructors Co.*, 355 NLRB 708, 719 (2010), enfd. 652 F.3d 22 (D.C. Cir. 2011).  Presuming the employer meets its burden, the burden then shifts to General Counsel to affirmatively show that the alleged misconduct did not occur.  *Kiewit Power*, 355 NLRB at 719.  Tim Dillett found Rehm's expressed concerns about safety in an email addressed to all employees because it should have been handled "one on one." Rehm, in fact, was not guilty of any misconduct, serious or otherwise. Dillett removed Rehm from Haven's schedule and services because of Rehm's protected concerted activity. Dillett's statement that Rehm should have kept the conversation about the safety concerns for a  one on one discussion demonstrates Dillett's belief that Rehm engaged in misconduct, which was untrue.  As the facts demonstrate that no misconduct occurred and Rehm made no refusals to work, I find that Respondent Haven violated Section 8(a)(1) by terminating Rehm on July 25.

    E.    The *Wright Line* Analysis

General Counsel analyzed this case as one involving mixed motives under *Wright Line,* 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).  As an alternative to *Burnip & Sims*, however, I still find that Respondent Haven violated Section 8(a)(1) when it terminated Rehm.

        1.    Applicable law

The *Wright Line* framework inherently is a causation test. *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 7 (2019), quoting *Wright Line*, 251 NLRB at 1089. To prove a discriminatory discharge for protected concerted activity, the General Counsel must demonstrate by a preponderance of the evidence that the employee's protected conduct was a motivating factor in the employer's discharge decision. *SBM Site Services, LLC*, 367 NLRB No. 147, slip op. at 2 (2019). In cases involving 8(a)(1) discipline, the General Counsel satisfies the initial burden by showing (1) the employee's protected concerted activity; (2) the employer's knowledge of the concerted nature of the activity; and (3) the employer's animus toward that activity. *Alternative Energy Applications Inc.*, 361 NLRB 1203, 1205 (2014). If the General Counsel makes the initial showing, the burden shifts to the employer to prove that it would have discharged the employee even in the absence of the employee's protected activity. *Donaldson Bros. Ready Mix, Inc.,* 341 NLRB 958, 961 (2004). The employer cannot meet its burden merely by showing that it had a legitimate reason for the discharge; rather, it must demonstrate that it would have taken the same action in the absence of the protected conduct. *Roure Bertrand Dupont, Inc.*, 271 NLRB 443, 443 (1984). If the evidence establishes that the reasons given for the employer's action are pretextual, e.g., either false or not in fact relied upon, the employer fails by definition to show that it would have taken the same action for those reasons and its *Wright Line* defense necessarily fails. *Metropolitan Transportation Services, Inc.*, 351 NLRB 657, 659 (2007).  Also see *Hard Hat Services, LLC*, 366 NLRB No. 106, slip op. at 7 (2018), and cases there cited.

The analysis above establishes that Rehm engaged in protected concerted activity or, in the alternative,  Dillett believed that Rehm engaged in protected concerted activity.  Therefore, the remaining prongs are Respondent's knowledge, animus and whether Respondent's actions are pretextual.

2.    Knowledge

Owner Dillett's knowledge of Rehm's protected concerted activity was demonstrated in
short order.  First, he was a recipient of her email expressing safety concerns.  Secondly, in his
5  response to Rehm's questioning on July 25, Dillett told Rehm that the "sensitive" matter should
have been handled one on one.  Thus, Dillett knew about Rehm's protected concerted activity.
*Pruitthealth*, 369 NLRB No. 22, slip op. at 18 (administrator's "possible ignorance of the law is not
ignorance of the protected activity itself").

10           3.    Animus

Proof of animus must "support finding that a causal relationship exists between the
employee's protected activity and the employer's adverse action against the employee."
*Tschiggfrie Properties*, 368 NLRB No. 120, slip op. at 1.  Proof of animus and discriminatory
15  motive may be based on direct evidence or inferred from circumstantial evidence.  Id., slip op. at
8; *Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1428-1429 (11th Cir. 1985); *LHoist North
America of Alabama, LLC, a Subsidiary of LHoist North America,* 370 NLRB No. 112, slip op. at
14 (2021).

20          Direct evidence is not usually available, but Dillett's July 25 email provides that evidence.
*LHoist*, 370 NLRB No. 112, slip op. at 14.  Dillet's initial claim respecting Rehm reaching out to
other employees is undermined when Dillett tells Rehm that the matter should be handled one on
one, rather to the group.  This statement demonstrates Haven and Dillett directing Rehm to keep
her safety discussions between them instead sharing her views with the entire employee cadre
25  about the lack of safety in the salon workplace.  This statement lends "independent" support for a
finding of animus.  *Cordua Restaurants*, 985 F.3d at 424-425.

Similarly, Manager Chonacki told Lyon she knew that Rehm could have problems because
of the email based upon similar experiences.  Because Chonacki is at least an agent, her
30  statement qualifies as an admission against interest.  Her opinion about Dillett's reaction is directly
relevant to DIllett's termination of Rehm.  *Cordua Restaurants*, 985 F.3d at 416.

Circumstantial evidence of animus may include evidence of suspicious timing, false or
shifting reasons provided for the adverse employment action; and disparate treatment of the
35  employees.  See generally *Tschiggfrie Properties*, 368 NLRB No. 12, slip op at 4, 8.

Animus can be inferred from the relatively close timing between an employee's protected
concerted activity and his discipline. *Corn Brothers, Inc.*, 262 NLRB 320, 325 (1982) (timing of
discharge within a week of union organizing meeting evidence of antiunion animus); *Sears
40  Roebuck & Co.,* 337 NLRB 443, 451 (2002) (timing of discharge, several weeks after employer
learned of protected concerted activities, indicative of retaliatory motive); *La Gloria Oil & Gas Co.*,
337 NLRB 1120 (2002) (timing of discipline imposed 4 months after service on bargaining team
and ULP hearing appearance suspect).  In *Parkview Lounge*, supra, citing *McClendon Electrical*
Services, 340 NLRB 613, 613 & fn. 6 (2003), the employer discharged the employee within 2 days
45  of the protected activity.  Dillett took Rehm off the schedule the day after Rehm emailed all
employees about the COVID concerns.  The one-day timing between Rehm's activity and
termination shows Haven's animus towards her protected concerted activity.

Shifting reasons and inconsistencies for a respondent's actions support a determination
50  of unlawful motive.  *Roemer Industries, Inc.*, 367 NLRB No. 133 (2019), enfd. 824 Fed.Appx. 396
(6th Cir. 2020). These inconsistencies also demonstrate the pretextual nature of Haven's actions

towards Rehm and support an inference of discriminatory motive. *Castro Valley Animal Hospital*, 370 NLRB No. 80, slip op. at 16-18; *Cordua Restaurants*, 985 F.3d at 426.

5     Respondent Haven shifted on two major points.  The first is that Rehm was not respectful of HIPAA requirements.  Dillett's July 25 email states he has to be concerned about an employee's personal health information.  This contention  is false as Dillett started the email discussion.  Rehm hit "respond all," which means that everyone was already on the email Tim Dillett sent. Nothing in Rehm's email reflects any release of personal health information, so this constitutes a shift.

10     In the second shift/inconsistency, DIllett changes on whether Rehm was terminated and when, or whether the NLRB terminated her, or whether she removed herself from employment. Dillett first fails to inform Rehm about removing her from the schedule.  As I found Haven terminated Rehm on July 25, Dillett's different statements about Rehm's employee status also demonstrate shifts in Haven's defense. "[W]hen an employer vascillates in offering a rational and
15 consistent account of its actions, an inference maybe drawn that the real reason for its conduct is not among those asserted." *Hahner, Foreman & Harness*, 343 NLRB at 1425 (internal quote and cites omitted).  These reasons cannot be believed. *Castro Valley Animal Hospital*, 370 NLRB No. 80, slip op. at 15-16.  Therefore, I reject Haven's inconsistencies for terminating Rehm.  *Hahner*, supra.

20

     Disparate treatment also demonstrates animus.  Haven also treated Rehm disparately for her "reply all" email, resulting in her termination the following day. Lyon, who only sent the email to Tim Dillett, suffered no consequences for sharing similar concerns.  When Rehm sent her individual emails to Dillett, she also suffered no consequences.  It was only after Rehm sent the
25 email with the "reply all" function to all employees that Haven responded with discharge.  This finding is bolstered by the direct evidence that Dillett told  Rehm to keep this sort of discussion "one on one," which demonstrates his requirement that employees not communicate with each other.

30     Based upon direct evidence of animus towards Rehm's protected concerted activities and Haven's shifting reasons, disparate treatment and timing, General Counsel demonstrated a causal relationship between Rehm's protected activities and Haven's adverse actions against Rehm.  *Tschiggfrie Properties*, 368 NLRB No. 120, supra.

35          4.  Pretext and Respondent's burden

     A respondent must show it would have taken the same action for legitimate reasons even in absence of protected activity.  *LHoist*, 370 NLRB No. 112, slip op. at 17, citing *Roemer,* 367 NLRB No. 133, slip op. at 17.  ". . . [A] finding of pretext necessarily means that the reasons
40 advanced by the employer either did not exist or were not in fact relied upon, thereby leaving inact the inference of wrongful motive established by the General Counsel." *Limestone Apparel Corp.*, 255 NLRB 722, 722 (1981), enfd. 705 F.2d 799 (6th Cir. 1982).  When pretext is found, dual motive no longer exists.  *La Gloria Oil*, 337 NLRB ay 1124.  When General Counsel makes a strong showing of discriminatory motive, Respondent's rebuttal burden "is substantial." *Bally's*
45 *Park Place, Inc. v. NLRB* 646 F.3d 929, 936 (D.C. Cir. 2011), enfg. 355 NLRB 1319 (2010).   I find, in the face of pretext, Respondent does not meet is burden.

     General Counsel makes a strong showing of discriminatory motive with direct and circumstantial evidence.  Several factors found in the Animus section also support a finding of
50 pretext.  The strongest is Respondent Haven made itself: Dillett's July 25 email, regarding the

19

"one on one" requirement for discussions coinciding with Rehm's complete removal from the schedule.

5      Haven's shifting explanations also provide strong evidence that Respondent's reasons for termination are pretextual. *Roemer Industries,* supra; also see *E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 44 (1st Cir. 2004), enfg. 339 NLRB 262 (2003) (shifting explanations for discharge may serve to ground or reinforce a finding of pretext). Haven puts forth a number of shifting statements whether Rehm was terminated at all, then concluded after the complaint issued that she was terminated. Haven's tardy Answer then offers to schedule Rehm for an unknown number of shifts,

10    which is too little, too late and then says her failure to contact it makes her termination, months after the actual termination.

       Because I find that Respondent Haven's reasons are pretextual, I need not explore any additional defenses it may have. Respondent's documents do not show it would have taken the

15    same action in the absence of protected activity.

       5. Conclusion regarding 8(a)(1) termination of Rehm per *Wright Line*

       I therefore find that Rehm engaged in protected concerted activity, Respondent knew of

20    the protected concerted activity or believed Rehm had engaged in that activity, and Respondent had animus towards that activity. General Counsel has sustained its burden of proof. I further find that Respondent Haven's defenses, as stated in its Answer and in communication with Rehm are pretextual. Respondent Haven therefore violated Section 8(a)(1) of the Act when it terminated Rehm for protected concerted activity on July 25.

25

# CONCLUSIONS OF LAW

1. Respondent Haven Salon + Spa, Inc. is an employer within the meaning of Section 2(2), (6) and (7) of the Act.
30   2. Owners Timothy Dillett and Carly Dillett are supervisors within the meaning of Section 2(11) of the Act and agents within the meaning of Section 2(13) of the Act.
3. Salon Manager Erica Chonacki is an agent within the meaning of Section 2(13) of the Act.
4. Respondent violated Section 8(a)(1) of the Act by:
   a. On July 25, 2020, Respondent impliedly told an employee that she could not
35        discuss certain safety concerns with anyone but management.
   b. On September 21, 2020, impliedly threatening an employee with legal action and other unspecified retaliation because the employee filed an unfair labor practice with the National Labor Relations Board.
   c. On October 19, 2020, impliedly threatening employees and an employee's family
40        with legal action and other unspecified retaliation because an employee filed an unfair labor practice charge with the Board.
5. On July 25, 2020, Respondent suspended and effectively terminated Charging Party Katherine Rehm by denying her all opportunities to work at Respondent's facilities in violation of Section 8(a)(1) of the Act.
45   6. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

# REMEDY

50    Respondent shall make whole its employee Katherine Rehm for any loss of earnings and other benefits suffered as a result of the unlawful termination. Backpay owed as a result of the

unlawful suspension and termination shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with *King Soopers, Inc.*, 364 NLRB No. 93 (2016), enfd. in relevant part 859 F.3d 23 (D.C. Cir. 2017), Respondent shall compensate Katherine Rehm for her reasonable search-for-work and interim employment expenses, if any, regardless of whether those expenses exceed interim earnings. Search-for-work and interim employment expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

Additionally, Respondent is ordered to compensate Katherine Rehm for the adverse tax consequences, if any, of receiving lump-sum backpay awards, in accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB 101 (2014), and file with the Regional Director for Region 18, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year for each affected employee in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB No. 143 (2016). In addition to the backpay-allocation report, Respondent must file with the Regional Director a copy of Katherine Rehm's backpay corresponding W-2 form(s) reflecting the backpay award. *Cascades Containerboard Packaging*, 370 NLRB No. 76 (2021); *Medina Gen. Construction, LLC*, 370 NLRB no. 87 (2021).

Respondent shall also be required to expunge from its files any and all references to Katherine Rehm's termination and to notify Rehm in writing that this has been done and that the termination will not be used against her in any way. *SW Design School, LLC, d/b/a Interns4Hire.com, K-12 Codes, and SW Design School, L3C,* 370 NLRB No. 77, slip op. at 3 (2021).

## ORDER

Respondent Haven Salon + Spa, Inc. shall

1.  Cease and desist from
    a.  Impliedly telling employees that they can only share safety concerns with management.
    b.  Threatening employees with unspecified reprisals and other actions against them because they participated in Board activities and protected concerted activities.
    c.  Threatening employees with unspecified reprisals against their family members because the employee participated in Board activities and protected concerted activities.
    d.  Discharging or otherwise discriminating against employees because of their protected concerted activities.
    e.  In any like or related manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.
2.  Take the following affirmative action necessary to effectuate the policies of the Act:
    a.  Within 14 days from the date of this Order, offer Katherine Rehm full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.
    b.  Make Katherine Rehm whole for any loss of earnings and other benefits suffered as a result of the discrimination against her, in the manner set forth in the remedy section of this decision, plus reasonable search-for-work and interim employment expenses.

       c.  Compensate Katherine Rehm for the adverse tax consequences, if any of receiving a lump-sum backpay award, and file with the Regional Director for Region 18, within 21 days of the date the amount the backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

       d.  File with the Regional Director for Region 18 a copy of Katherine Rehm's back corresponding W-2 forms reflecting backpay.

       e.  Within 14 days from the date of this Order, remove from its files any reference to the unlawful suspension and discharge of Katherine Rehm, and within 3 days thereafter, notify Rehm in writing that this has been done and the suspension and discharge will not be used against her in any way.

       f.  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such record if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

       g.  Within 14 days after service by the Region, post at its New Berlin and Muskego, Wisconsin facilities copies of the attached notice marked "Appendix."[15]  Copies of the notice, on forms provided by the Regional Director for Region 18, after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If Respondent has gone out of business or closed any facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since July 24, 2020.

       h.  Within 21 days after service by the Region, file with the Regional Director for Region 18 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

---

[15] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region.  If the facilities involved in these proceedings are closed to due to Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work.  Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if Respondent customarily communicates with its employees by electronic means.  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

JD-21-21

Dated  Washington, DC  April 30, 2021

5

Sharon Levinson Steckler
Administrative Law Judge

23

**APPENDIX**

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated
Federal labor law and has order us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO
Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT impliedly tell you that you can only discuss safety concerns with management.

WE WILL NOT impliedly threaten you or your family with unspecified reprisals and actions because you participate in activities with the National Labor Relations Board.

WE WILL NOT discharge you because of your protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of this Order, offer Katherine Rehm full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL compensate Katherine Rehm for any loss of earnings and other benefits suffered as a result of her unlawful suspension and discharge, less any interim earnings, plus interest, and WE WILL also make Rehm whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Katherine Rehm for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 18, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 18 a copy of Katherine Rehn's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of this Order, remove from our files any reference to Katherine Rehm's unlawful suspension and discharge, and WE WILL, within 3 days thereafter, notify her in writing that this has been done and that the loss of employment will not be used against her in any way.

JD-21-21

Haven Salon + Spa, Inc.
_____
(Employer)

Dated _____    By _____
                              (Representative)              (Title)


The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website:  www.nlrb.gov

Federal Office Building, 212 3rd Avenue, S. Suite 200, Minneapolis, MN 55401-2221
(612) 348-1797, Hours: 8:00 a.m. to 4:30 p.m.


The Board's decision can be found at https://www.nlrb.gov/case/18-CA-266091 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER (414) 930-7203.



UNITED STATES GOVERNMENT

**NATIONAL LABOR RELATIONS BOARD**

**OFFICE OF THE GENERAL COUNSEL**

Washington, D.C.  20570

August 2, 2021

Clerk, United States Court of
  Appeals for the Seventh Circuit
Everett McKinley Dirksen Courthouse
219 South Dearborn Street, Rm. 2722
Chicago, IL 60604

Re:  *NLRB v. Haven Salon + Spa, Inc.*,
Board Nos. 18-CA-266091 and 18-CA-
267818

Dear Clerk:

     I am enclosing the Board's application for summary entry of a judgment enforcing the Board's order in this case, and a proposed judgment.

     Please serve a copy of the application on Respondent, whose addresses appear on the service list.  I have served a copy of the Board's application and proposed judgment on each party admitted to participate in the Board proceedings, and their names and addresses also appear on the service list.

     I am counsel of record for the Board, and all correspondence should be addressed to me.

Very truly yours,

/s/Ruth E. Burdick

Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E.
Washington, D.C.  20570
cc & documents to: Service List    (202) 273-2960

<u>SERVICE LIST</u>

<u>RESPONDENT</u>:
Timothy Dillett, Owner
Carley Dillett, Registered Agent
Haven Salon + Day Spa, Inc.
W145S7644 Durham Drive
Muskego, WI 53150

Tel: (262) 971-2000
Email: tim@myhavensalon.com

<u>CHARGING PARTY</u>:
Katherine Rehm
S67W14950 Golden Country Dr.
Muskego, WI 53150

Telephone: (414) 534-0132
E-mail: katerehm@gmail.com

<u>REGIONAL DIRECTOR</u>:
Jennifer A. Hadsall, Rgnl. Dir.
National Labor Relations Board
Federal Office Building
212 3rd Ave. S, Ste. 200
Minneapolis, MN 55401-2221

Tel: (612) 348-1757