# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **NATIONAL LABOR RELATIONS BOARD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-2413** |
| | ) | |
| **HAVEN SALON+SPA, INC.,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |
| | ) | |

_____

## NATIONAL LABOR RELATIONS BOARD'S MOTION FOR LIQUIDATION OF FEES, ADDITION OF NEW RESPONDENTS IN CONTEMPT, AND WRITS OF BODY ATTACHMENT

To the Honorable, the Judges of the United
  States Court of Appeals for the Seventh
  Circuit:

    The National Labor Relations Board ("Board" or "NLRB"), an

administrative agency of the United States Government, respectfully petitions the

Court to liquidate the fines and attorneys' fees that it has imposed on Haven Salon

+ Spa, Inc. ("Haven"), add Timothy Dillett and Carley Dillett ("the Dilletts") as

additional respondents in contempt, and issue writs of body attachment against the

Dilletts.

When this Court held Haven in contempt on February 27, 2023, it expressly noted that "the Board may seek additional remedies" if Haven failed to eliminate the contempt. (Doc. 12 at 5). Because Haven has failed to take any steps to purge itself of contempt, the time for enhanced remedies has now come. As officers and agents of Haven, the Dilletts are expressly bound by this Court's September 30, 2021 Judgment, and their active steering of the company's noncompliance with this Court's orders necessitates the additional remedies now sought by the Board.

## BACKGROUND

1.    At all relevant times, Timothy Dillett and Carley Dillett, a married couple, have been the sole owners of Haven. (Dillett Aff. ¶ 1). Timothy Dillett is the company's Director of Operations. *Id.* Carley Dillett is the company's registered agent according to records maintained by the Wisconsin Department of Financial Institutions. (Ali Decl. Ex. 1).

2.    In its February 27, 2023 Opinion and Order ("Contempt Order") (Doc. 12), this Court found Haven in contempt of the Court's September 30, 2021 judgment ("Enforcement Judgment") enforcing a Board Order, which requires Haven to, among other actions, remove from its files any reference to the unlawful suspension and discharge of employee Katherine Rehm and inform her that this has been done and that the suspension and discharge will not be used against her; post at Haven's two facilities signed copies of the Notice to Employees; and file a sworn

2

certification with the Board attesting to the steps Haven has taken to comply with the judgment.

3.     In the Contempt Order, the Court noted Haven's history of noncooperation and that "[a]ll indications are that Mr. Dillett is intentionally ignoring the Board and now our court." (*Id.*)

4.     Per the Contempt Order, Haven could purge itself of contempt by complying with the Enforcement Judgment and paying the Board's reasonable costs and expenses, including attorneys' fees. The Contempt Order further instructed Haven to pay a fine of $1,000, as well as a daily fine of $150 commencing on February 28, 2023. If Haven did not eliminate the contempt by the following week (i.e., by March 6, 2023), the daily fine would increase by $100 on each subsequent day. This Court provided Haven an opportunity to avoid all fines by filing, within seven days of the Contempt Order, a sworn statement "demonstrating full compliance with the Board's order and [the Court's] requirements," but Haven did not do so.

5.     The Contempt Order instructed the Board to provide an accounting of its costs and attorneys' fees. The Board filed its Statement of Attorney Fees and Statement in Support on March 6, 2023 (Doc. 13), calculating $9,453.10 in costs and fees.

6.     Haven has not complied with or even responded to the Contempt Order. This is so despite the Contempt Order directing the Clerk of Court to send "this [Court's] opinion by certified U.S. mail and email to all known addresses of Haven and Timothy Dillett." (Doc. 12 at 5). Furthermore, the Board sent copies of the Contempt Order to Timothy Dillett via first-class U.S. mail, United Parcel Service ("UPS") (both copies addressed to the Dilletts' residence at W145S7644 Durham Drive, Muskego, WI 53150) and email; and to Haven's Muskego facility via UPS. (Ali Decl. ¶ 4 & Ex. 2). The physical copies of the Contempt Order sent by the Board were returned. (Ali Decl. Ex. 3A, 3B).

7.     The Board, in an additional step to encourage compliance with this Court's requirements, utilized a process server to serve the Contempt Order on Haven. The process server made five attempts to serve the Contempt Order. (Ali Decl. Ex. 4).

8.     In the first attempt, on March 16, 2023, the process server went to Haven's Muskego facility and found the business to be operational. (*Id.* at p. 1). He spoke to the female hairstylist working there, who acted in a strange and dismissive manner and stated that Timothy Dillett did not work there, that she did not know how to reach him, and that no manager was available. (*Id.*). The process server later located the Facebook profile of a "Carley Marie" who matched the physical appearance of the hairstylist and whose listed occupation was "Managing Director

4

of Haven Salon + Spa." (*Id.* at pp. 1, 12). It is likely, therefore, that the hairstylist whom the process server spoke to was Carley Dillett, and that she had concealed her identity and position with Haven to avoid service. Later that day, the process server made a second attempt to serve the Contempt Order by going to the Dilletts' Durham Drive residential address, but no one answered. (*Id.* at p. 1).

9.    In the process server's third attempt to serve the Contempt Order on March 16, 2023, he went to the Dilletts' residential address at W184S8538 Dean Court, Muskego, WI 53150).[1] (Ali Decl. Ex. 4 at p. 1). The man who answered the door claimed that Timothy Dillett was not home, that the man did not know how to reach Timothy Dillett, and that the name did not sound familiar. (*Id.*). The process server later located a Facebook profile of a Timothy Dillett who matched the physical appearance of the man at the house and who was pictured with the woman described in ¶ 8 above. (*Id.* at pp. 1, 18). As before, it is likely that the man at the house was Timothy Dillett and that he concealed his identity to avoid service. (*Id.*). On March 17, 2023, the process server made a fourth attempt to serve the document by going to the Haven's Muskego facility, but the facility was closed at the time. (*Id.* at p. 1).

---

[1] The Board had previously attempted to send its orders and this Court's orders, including the Enforcement Judgment, to this address on June 14, 2022 via first-class and certified U.S. mail and UPS. (Ali Decl. Ex. 5). However, the documents had been returned, with "Return To Sender" and "Not a Business" handwritten on one of the envelopes. (Ali Decl. Ex. 6).

10.    In the process server's fifth attempt, on March 18, 2023, he left the document with the receptionist at Haven's Muskego facility, who stated that the Dilletts were not present and agreed to give the document to them or another manager. (*Id.* at p. 1).

## ARGUMENT

### I.    Liquidation of Fines and Attorneys' Fees Imposed Against Haven is Appropriate Here.

Courts are authorized to liquidate the fines that they have imposed on contemnors. *See In re Sealed Case*, No. 23-5044, 2023 U.S. App. LEXIS 20733, at *1, *35 (D.C. Cir. Jul. 18, 2023) ("A civil-contempt proceeding requires: (1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled.") (internal quotations marks omitted); *Disability Advocates & Counseling Group v. Floval Oil Corp.*, No. 05-23238-CIV-MARRA/JOHNSON, 2011 U.S. Dist. LEXIS 161630, at *1, *7 (S.D. Fla. May 31, 2011) (magistrate judge recommending liquidation of contempt fines, reasoning that such liquidation falls under the court's "inherent power to vindicate its own authority and to effectuate its own decrees"), *approved in part and modified in part by* 2011 U.S. Dist. LEXIS

161631 (S.D. Fla., Sept. 20, 2011). Since Haven has refused to comply with the Enforcement Judgment even after the Court issued fines for noncompliance in its Contempt Order, an order liquidating at least a portion of the fines and attorneys' fees that have accumulated thus far would disabuse Haven of the notion that it can ignore the Court's directives. Prompt liquidation would enable the Board to begin immediate collection actions, which should capture Haven's attention.

In order to shield Haven from the full financial impact of its noncompliance,[2] the Board seeks an order liquidating fines that had accumulated as of March 25, 2023, which was one full week after the Board's process server delivered the Contempt Order to Haven's receptionist. Pursuant to the Contempt Order's fine schedule, Haven incurred $23,900 in fines as of March 25, 2023. This amount is the sum of the $1,000 fine for Haven's overall violation and the accumulated daily fines, which began on February 28, 2023. The Board's attorney fees, calculated pursuant to the Contempt Order, amount to $9,453.10, as previously stated. The Board respectfully requests that the Court issue an order liquidating these fines and fees as described.

## II.     Timothy Dillett and Carley Dillett Should be Added as Additional Respondents in Contempt.

Nonparties to an action, like the Dilletts here, may be held in contempt. In

---

[2] For perspective, per the Contempt Order's fine schedule, Haven has accumulated $1,111,900 in fines as of July 31, 2023.

*Stotler & Co. v. Able*, this Court stated that "a court may find a nonparty in contempt if that person has actual knowledge of the court order and either abets the party named in the court order or is legally identified with him." 870 F.2d 1158, 1164 (7th Cir. 1989) (internal brackets and quotation marks omitted).[3] Decisions holding nonparties in contempt often arise after a named party fails to comply with an injunction. This is so because "an injunction binds not only the parties to the injunction but also nonparties who act with the named party." *SEC v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008). Were it otherwise, "the named parties could easily thwart the injunction by operating through others." *Id.*

This Court's September 30, 2021 Enforcement Judgment is functionally an injunction. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13-15 (1945). In addition, the Enforcement Judgment expressly binds not only Haven but also its "officers[ and] agents." (Doc. 2-2). The Dilletts hold themselves out to be officers and agents of the company, thus "making the underlying injunction

---

[3] A court's authority to hold a nonparty in contempt has been affirmed by the Supreme Court. *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 325 (1904) (holding that a person, "not a party to the suit, [may be] guilty of contempt for violation of an order of that court, made in such suit, and imposing a fine for such contempt"); *see also Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (while a court cannot "enjoin the world at large," a nonparty "may be punished" if they "abet the defendant [or is] legally identified with him"); *Chi. Truck Drivers Union Pension Fund v. Brotherhood Lab. Leasing*, 207 F.3d 500, 507 (8th Cir. 2000) ("It is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it.").

applicable to [the Dilletts], and [their] company's failure to comply with it [their] problem, too." *Cent. States, Se. & Sw. Areas Pension Fund v. Wintz Props., Inc.*, 155 F.3d 868, 874 (7th Cir. 1998).[4]

Moreover, the Dilletts have received multiple notices of the Enforcement Judgment, despite their many attempts to avoid service.[5] And, by all indications, the Dilletts' evasive maneuvers have the common purpose of abetting Haven's

---

[4] *Accord Chi. Truck Drivers*, 207 F.3d at 507 (holding that defendant companies' nonparty "sole shareholder, corporate officer and agent" was "legally identified with the [companies] that he was in a position to carry out acts on their behalf" and could be subject to a contempt finding for the companies' violation, "even though the order made no specific reference to him"); *NLRB v. Int'l Shoe Corp.*, 423 F.2d 503, 505 (1st Cir. 1970) (where defendant company had violated an order to bargain in good faith, the court held it in contempt, and added its president as a party in contempt because the latter had played a key role in the company's noncompliance); *Pension Trust Fund v. Elite Rebar, LLC*, No. 4:21-cv-00721-AFG, 2022 U.S. Dist. LEXIS 104056, at *1, *7-9 (E.D. Mo., June 10, 2022) (holding both the noncompliant company and its nonparty president, sole organizer, and registered agent in contempt for the company's noncompliance, stating that a "corporate officer is responsible for a corporation's actions when he was in a position to carry out acts on its behalf") (internal brackets and quotations marks omitted).

[5] In *Painters Dist. Council No. 2 v. Paragon Painting of Mo., LLC*, where a company remained noncompliant with an order, the district court found that "evidence of [the company principal's] contempt is the fact he was found and served with the Court's prior Order at the same address the Court's prior mailings had been returned non-deliverable". No. 4:08CV01501 ERW, 2011 U.S. Dist. LEXIS 97880, at *1, *3 (E.D. Mo. Aug. 31, 2011). Similarly, here, the Board's process server provided a sworn statement that he found Timothy Dillett at the Dean Court residence and that it is likely that Dillett had concealed his identity. Prior mail from the Board to that address had been returned to sender. (Ali Decl. Ex. 6).

noncompliance with this Court's orders.[6] Thus, the necessary prerequisites for adding the Dilletts as additional respondents in contempt and for holding them in contempt are satisfied here.

### III.   Issuance of Writs of Body Attachment Is Necessary to Coerce Compliance with the Court's Orders.

The Board respectfully requests that, upon finding the Dilletts in contempt, the Court order civil body attachment, as the Board requested in its Petition for Contempt. (Doc. 6 at 7, ¶ E). The Contempt Order authorized the Board to seek additional remedies if Haven's noncompliance continued. (Doc. 12 at 5). The Dilletts, as Haven's owners, officers, and agents, are wholly responsible for Haven's disregard of this Court's orders. There is no sign that they will cause the company to comply. Indeed, there is no reason to believe that the Dilletts will take even a single step required by this Court's orders absent application of highly coercive measures. It is therefore appropriate to order body attachment here.

---

[6] Under Federal Rule of Civil Procedure 65(d), "nonparties with notice of the Court's order who are in active concert or participation with a party or who aid and abet a party's violation of the order may be held liable for contempt." *Select Creations, Inc. v. Paliafito Am., Inc.*, 906 F. Supp. 1251, 1272 (E.D. Wis. 1995) (citing *United States v. Board of Ed. of City of Chi.*, 11 F.3d 668, 673 (7th Cir. 1993). "The standard for proof of aiding and abetting . . . . has two prongs, 'association and participation; that is, intent plus some overt act designed to aid in the success of the venture.'" *Id.* at 1272-73 (quoting *United States v. Beck*, 615 F.2d 441, 448-49 (7th Cir. 1980)). The Dilletts' intent to violate the Enforcement Judgment is demonstrable from overt acts such as their apparent failure to truthfully identify themselves to the Board's process server. (Ali Decl. Ex. 4).

Writs of body attachment are a traditional and appropriate remedy to compel compliance with a court decree and to effectuate purgation of contumacious conduct, and the circuit courts have specifically approved their use to coerce compliance with enforced Board orders. *See e.g., NLRB v. HH3 Trucking, Inc.*, Nos. 05-1362, 05-4075, 2013 U.S. App. LEXIS 6149, at *1, *2 (7th Cir. Jan. 10, 2013); *NLRB v. Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 636 (9th Cir. 1977); *NLRB v. Interurban Gas Corp.*, 401 F.2d 745, 746 (6th Cir. 1968); *NLRB v. Savoy Laundry*, 354 F.2d 78, 81 (2nd Cir. 1965); *NLRB v. A.S. Abell Co.*, 97 F.2d 951, 959 (4th Cir. 1938) ("The responsibility of enforcing an order of the Board is imposed on this court, and if necessary, compliance may be compelled by attachment for contempt.").

The purpose of a writ of body attachment is not to punish, but to compel obedience to a judicial mandate; it is that purpose that renders the commitment civil, rather than criminal, in nature. *Shillitani v. U.S.*, 384 U.S. 364, 368 (1966); *NLRB v. Ironworkers Loc. 433*, 169 F.3d 1217, 1222 (9th Cir. 1999); *In re Irving*, 600 F.2d 1027, 1031 (2d Cir. 1979); *In re Nevitt*, 117 F. 448, 461 (8th Cir. 1902) (individuals incarcerated to compel obedience "carry the keys of their prison in their own pockets").

It is further appropriate for a court, as here, to hold in contempt and issue a writ of body attachment against an individual who had hitherto been a nonparty.

*Paisley Park Enters v. Boxill*, No. 17-cv-1212 (WMW/TNL), 2019 U.S. Dist. LEXIS 108346, at *1, *12-13 (D. Minn. Ct. June 27, 2019) (where a company remained noncompliant even after the district court threatened to impose fines and assessment of attorneys' fees, the magistrate judge stated that "[t]he only meaningful sanction remaining . . . . now is the issuance of a bench warrant for the arrest" of the company's sole officer), *adopted by* 2019 U.S. Dist. LEXIS 147433; *Emps. & Cement Masons #90 Health & Welfare Fund v. JMY Plastering Specialist, LLC*, No. 4:22-cv-00241-MTS, 2022 U.S. Dist. LEXIS 113955, at *1, *2 (E.D. Mo. June 28, 2022) (stating that contempt proceedings against a noncompliant company "could result in the Court's issuance of a writ of body attachment that directs the United States Marshals to bring before the Court an officer or agent of [the company] who had notice of the Court's order"); *Elite Rebar*, 2022 U.S. Dist. LEXIS 104056 at *9-10 (issuing contempt and writ of body attachment against noncompliant company's owner after he had ignored the court's order to show cause why he and the company should not be held in contempt); *Paragon Painting*, 2011 U.S. Dist. LEXIS 97880 at *2 (finding in contempt and issuing both monetary sanctions and writ of body attachment against principal of noncompliant company). Here, the Dilletts have caused Haven to flout the Court's orders for over a year and a half, and they appear determined to continue their contumacious conduct until the Court utilizes more coercive measures.

Wherefore, based on the foregoing, the Board respectfully requests that the Court liquidate a portion of the accrued fines, fees, and costs, add the Dilletts as additional respondents in contempt, and issue writs of body attachment against Timothy Dillett and Carley Dillett substantially in the form of the proposed writ attached to this filing.

Respectfully submitted,

**NATIONAL LABOR RELATIONS BOARD**

HELENE D. LERNER
Deputy Assistant General Counsel
Tel: (202) 273-3738
helene.lerner@nlrb.gov

KEVIN P.
FLANAGAN
Supervisory
Attorney
Tel: (202) 273-2938
Kevin.Flanagan@nlrb.gov

s/Arish S. Ali
ARISH S. ALI
Trial Attorney
Tel: (202) 701-4804
arish.ali@nlrb.gov

Contempt, Compliance, and Special Litigation
Branch 1015 Half Street, SE, 4th Floor
Washington, D.C.  20003
Fax: (202) 273-4244

Dated at Washington,
D.C., this 21st day of
August, 2023

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the Court's CM/ECF system on August 21, 2023. I further certify that a copy of the foregoing was served on the Respondent by email at [tim@myhavensalon.com](mailto:tim@myhavensalon.com) and by UPS overnight mail at the following addresses:

Haven Salon+Spa, Inc.        Haven Salon+Spa, Inc.
c/o Tim Dillett                    c/o Tim Dillett
W145S7644 Durham Drive    W184S8538 Dean Court
Muskego, WI 53150            Muskego, WI 53150-8966

/s/ Arish Ali
*Trial Attorney*

County of ___Waukesha___          Case ___18-CA-266091___

State of ___Wisconsin___

## Confidential Witness Affidavit

I, ___Timothy V. Dillett___ , being first duly sworn upon my oath, hereby state as follows:

1
2
3
4

**I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.**

My address is ___S76W17789 Janesville Rd, Muskego, WI 53150___    My telephone number is
___(262) 971-2000___   I am employed by ___Haven Salon + Day Spa___
whose address is ___S76W17789 Janesville Rd, Muskego, WI 53150___

5   1. My wife, Carley Dillett, and I own Haven Salon + Day Spa (Employer). We have operated
6      the Employer since 2013. We have two locations, one in Muskego, Wisconsin and one in
7      New Berlin, Wisconsin. My job title at the Employer is Director of Operations. Carley has
8      stepped back a bit from the business to focus on raising our kids but she is currently
9      focusing on marketing and purchasing of inventory for the Employer.
10  2. Katie Rehm was a former employee of the Employer. She worked for us off and on for
11     approximately 3 years. Katie worked as a Front Desk Concierge at both of our locations
12     and since February 2020, served as the Communications Lead.
13  3. We had to shut down both of our salons around mid-March 2020 due to the COVID-19
14     pandemic.
15  4. On May 11, 2020, I emailed all the staff and informed them that the salons would be
16     reopening on May 26, 2020. The email also detailed the safety procedures the Employer
17     planned to implement before that date. On May 14, 2020, I emailed all the staff again and
18     informed them that we would be actually be reopening on May 18, 2020 now that the
19     Wisconsin Supreme Court immediately lifted the safer-at-home order. Katie emailed me
20     on May 15, 2020 with some questions she had and she also expressed some concern
21     about returning to work. I replied to this email, thanked Katie, told her we could discuss
22     these issues in the staff meeting that was planned for the next day, and told her that in

Page 1

**Privacy Act Statement**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

1   regards to the issues of masks that was a touchy subject but we are providing them to

2   employees and recommending employees wear them. I also explained that Carley and I

3   would not open the business if we thought there were serious risks in the approach we

4   were taking and we would have a GPS (an air purification system that kills viruses in the

5   air and on surfaces) in place in 1-2 weeks at both locations.  On May 17, 2020, I emailed

6   all the staff our policies and best practices that we put in place to ensure the health and

7   safety of our guests and employees. The email also contained links to various videos

8   about the precautions put in place and a survey to get feedback regarding re-opening and

9   confirming that people read and understood the contents of the email. The email informed

10  employees would receive one hour of pay at 1.5 times the normal wage for completing the

11  videos and survey since this needed to be completed on a Sunday.

12  5.  On May 18, 2020, I also received an email that was forwarded to me from Sarah Brown,

13      who is the Front Desk Manager and Katie's manager, from Katie on May 17, 2020. This

14      was an email that Katie sent to Sarah with questions about the email I sent earlier that

15      morning (May 17) and Katie's thoughts on whether or not people should be mandated to

16      wear masks. I emailed Sarah on May 19, 2020 and told her I would address these issues

17      with Katie but I provided my initial answers to the questions in the email. I recall

18      addressing these with Katie in a first couple days of us opening back up.

19  6.  After we reopened, I recall having a discussion with Katie at some point because the

20      newly installed contactless payment was not working properly. Unfortunately, it took

21      longer to get that system in place than I wanted it to. I also recall Katie suggesting to me

22      that we should have plexiglass in front of the reception desk or putting something 6 feet

23      out from the reception desk so a guest could not get within 6 feet of the desk.  I told her I

24      would look into it.  I  ultimately decided not to install either of those items because I didn't

25      think it would really prevent the spread of the virus based on the research I did. I thought it

26      would just be an extra expense and I communicated this back to Katie.

27  7.  On or about July 24, 2020, I received a text message from a hairstylist at the Muskego,

28      Wisconsin location named Maura Treichel saying she tested positive for COVID-19.

29      Maura did not tell me where she thought she caught the virus from. I asked her when she

30      thought she might have been in contact with the infected person and she said Wednesday

31      night. Once Maura informed me of this, I looked at the calendar and she had not worked

32      the day before, although she had worked on other days earlier in the week.

- 2 -

1    8. I don't recall having a conversation with Katie on July 24, 2020 regarding Maura or an
2       employee possibly testing positive for COVID-19.
3    9. At 3:46 p.m., I sent an email to staff at both locations informing them that an employee of
4       had tested positive for COVID-19. I also stated that through my discussion with the
5       employee, we determined that the employee was not in contact with any other employees
6       between the time of exposure to the virus and the time the email was sent. I did not name
7       Maura in the email because I was trying to keep her health information confidential.
8    10. I thought there was no risk of exposure for employees because Maura said she was in
9       contact with the person on Wednesday night and she had not worked since then. I am not
10      allowed as a business to tell everyone to go tested but I figured if I went ahead and put all
11      of the information out there and an employee started exhibiting symptoms, then they
12      would consider that possibly they come in contact with COVID-19 with Maura. I did not do
13      any research into what the CDC says about the time between exposure and testing or
14      about how long an infected person sheds the virus.
15   11. In response to my email, an esthetician at Muskego named BillieJo Lyon, sent me an
16      email stating that she worked with Maura on Monday and Wednesday and she needed to
17      find time the next day to get tested. I replied to the email and informed her that Maura said
18      she was not in contact with the person who tested positive until Wednesday night and
19      then she got tested on Thursday so I wouldn't get tested unless she felt the need based
20      on getting symptoms. Billie replied that "she lives her mom." I had no clue what Billie
21      meant by this. Billie also stated that a doctor told her there was no way that a person
22      could test positive less than 24 hours after being exposed. Billie emailed me again a
23      couple hours later and said she needed to take the day off the next day because she
24      wanted to get tested and she did not feel comfortable getting close to people's face unless
25      she was negative.
26   12. Katie replied all to my email later that evening. Katie said that she felt uncomfortable to
27      come back to work at the moment and unless the employee had not been at the salon in
28      the last 10 days, she was not sure how the risk of exposure to the remaining staff/guests
29      could be discounted. She also said that she spoke to her doctor and she would be getting
30      tested tomorrow. I believe I received this email the following day.
31   13. My initial reaction to Katie's email was that I thought I did everything I needed to.  I
32      thought I made the best decision as the business owner with the information I had and



1    this is why I sent the email to the entire team. I did not have any feeling about the fact that

2    she sent the email to all the staff and not just me.

3    14. I don't recall a text from Katie on the morning of July 25, 2020. I think I had my kids that

4    day which is why I did not respond to her email right away.  After reading her email, I

5    made the decision on my own to remove Katie from the schedule for the rest of July and

6    all of August. We plan the front desk schedule a month in advance and it takes a lot of

7    effort to shift things around and find coverage. When someone in out, I have to find

8    someone to flex in and possibly work extra hours or I don't have any coverage and then

9    I'm trying to pull people off the floor to cover those hours. We were already planning to

10   bring in a new employee for extra coverage at the time of these events so I figured the

11   new employee could take Katie's hours. I decided to remove Katie for these five weeks

12   because it was my interpretation of her email that she did not feel comfortable working at

13   the Employer and she was asking for time off away from work. I did not consider this

14   removal from the schedule a termination.

15   15. On July 25, 2020 at 1:26 p.m., I replied directly to Katie about her email; Carley was

16   copied on this email. I told her I respected her opinion and the concerns she shared with

17   the entire staff. I also said that I was following up and continuously reviewing every

18   decision I make so it is in the best interest of employees and guests. I mentioned that

19   HIPPA was a big concern for me. (This was in regards to wanting to protect the

20   confidentiality of employee health information).  In the email, I also told Katie that COVID-

21   19 was a sensitive topic where concerns should be discussed one-on-one, especially as it

22   related to doing business during this difficult time. I said this because in the past, I've

23   always had one-on-one conversations with Katie about her concerns related to COVID-19

24   and I thought that was best instead of putting that out there to everyone. In the email I

25   said that as it related to her concerns in her email, I would have a new employee take

26   Katie's shifts this upcoming week and I changed the August schedule. I told Katie as well

27   that as we approached mid-August, if she liked, then we could sit down and discuss and

28   review September based on how she felt at the time. I ended the email by saying I would

29   look for her to reach out based on her comfort level returning to work and at that time we

30   could review any shift needs in September.

31   16. Also on July 25, 2020, I emailed Billie in the evening and asked her if she had an

32   estimate on when her test results would be cleared and I informed her that I adjusted her

33   books for now based on the estimated times I've heard it takes. I think I initially took her



1    off the schedule for an entire week. Billie replied to my email later that evening and said it

2    should be 2-3 days. I replied, thanking her and telling her that I was here to support her.

3  17. At 8:23 p.m. on that same date (July 25), Rehm replied to my email; Carley was copied on

4    this email. In the email, she expressed her concerns about possibly being exposed. She

5    also stated she was not refusing to work and she did not allude to abandoning her role

6    and removing her from the schedule for five weeks without discussion or explanation put

7    her and her family in a difficult position. She also wrote a paragraph about her position on

8    masks and the safety precautions she advocated for. She ended the email by stating she

9    would appreciate the opportunity for further discussions/explanation regarding the

10    changes made to her schedule and she will begin pursuing unemployment options in the

11    meantime. I did not reply to that email. I didn't see the email for a few days and when I did

12    see it, I figured I already made my decision to take her off the schedule for all of August

13    so we would discuss her hours if and when she contacted us in mid-August. I thought it

14    was her responsibility to reach out back to me in mid-August to discuss her schedule.

15  18. Katie never contacted me again after that email. As a result, Katie was not put on the

16    September schedule. I never really thought too much about Katie's employment status but

17    we did not think that we terminated her.

18  19. Once I got the NLRB charge, I considered that Katie's resignation; I considered her an

19    employee up until then.

20  20. I believe I got the normal letter from Unemployment about Katie seeking benefits but I did

21    not send anything in in response.

22  21. I don't believe I revoked Katie's email access until after I received the NLRB charge. I

23    know Katie had problems accessing her email before the events described above so

24    maybe that was why she could not log in.

25  22. I also don't believe I revoked Katie's access to our scheduling software, Zenoti, until after I

26    received the NLRB charge. Once we installed the geo-fence for the contactless payment

27    system, no one could connect to Zenoti unless they were within the perimeters of one of

28    our locations.

29  23. I don't think I canceled Katie's personal hair and waxing appointments. I think she called

30    our front desk and canceled all her appointments.

31  24. On July 27, 2020, Billie emailed me and informed me her test results were negative. I

32    replied and told her that I removed the block from her schedule the next day. The reason

33    why Billie was not removed for as long as Katie is because they are in different roles. The



1    front desk schedule needs to be done a month in advance and if someone is gone, it is

2    difficult to get coverage. If a spa employee, like Billie is gone, it doesn't shut down my

3    business and it just means her books are not open for appointments.

4    25. Besides Katie, I have not removed anyone else from the schedule based on my

5    interpretation of something they said to me.

6    26. At this time, I am not prepared to provide testimony regarding the allegations contained in

7    Case 18-CA-267818 that was filed yesterday.

8    I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit
9    again I remember anything else that is relevant, or desire to make any changes, I will immediately notify the
10   Board Agent. I understand that this affidavit is a confidential law enforcement record and should not be shown
11   to any person other than my attorney or other person representing me in this proceeding.

12   I have read this statement consisting of __6__ pages, including this page, I fully understand its contents, and I
13   certify that it is true and correct to the best of my knowledge and belief.

Executed on _____October 21st 2020_____ in _____Muskego, Wisconsin_____
                        (Date)                              (City, State)

_____
                    **Timothy Dillett**

- 6 -

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

——————————————————————————

|                                                        |   |                   |
|--------------------------------------------------------|---|-------------------|
| NATIONAL LABOR RELATIONS BOARD,                        | ) |                   |
|                                                        | ) |                   |
| Petitioner,                                            | ) |                   |
|                                                        | ) |                   |
| v.                                                     | ) | Case No. 21-2413  |
|                                                        | ) |                   |
| HAVEN SALON+SPA, INC.                                  | ) |                   |
|                                                        | ) |                   |
| Respondent.                                            | ) |                   |
|                                                        | ) |                   |

——————————————————————————

## <u>DECLARATION OF ARISH S. ALI</u>

I, Arish S. Ali, hereby make the following Declaration under penalty of
perjury pursuant to 28 U.S.C. § 1746. The subject of this declaration and the
statements set forth herein are true and correct to the best of my belief, either on
the basis of my personal knowledge or information acquired by me in the
performance of my official duties.

1.      I am a Trial Attorney in the Contempt, Compliance, and Special
Litigation Branch of the National Labor Relations Board ("NLRB" or
"Agency"). I have served in this capacity since November 8, 2021 and have been
employed by the NLRB since the same date.

1

2.     I have reviewed the case file for this matter in the Board's case-management system.

3.     Attached as Exhibit 1 is a true and correct copy of the *Corporate Records for Haven Salon + Spa, Inc.* ("Haven") found on the Wisconsin Department of Financial Institutions, https://dfi.wi.gov/Pages/Home.aspx, last visited on May 10, 2023. I have reviewed the case file for this matter in the Board's case-management system.

4.     On February 27, 2023, I sent the Court's contempt order from the same date to the Dilletts' residence at W145S7644 Durham Drive, Muskego, WI 53150 ("Durham Drive") via regular mail and United Parcel Service ("UPS") overnight mail, and to Haven's facility at S76W17789 Janesville Road, Muskego, WI 53150 ("Janesville Road") via UPS overnight mail. On the same date, I sent the contempt order to Tim Dillett via email. Attached as Exhibit 2 is a true and correct copy of my *February 27, 2023 Email to Tim Dillett*, which is stored in the Board's case-management system.

5.     Attached as Exhibit 3A and 3B are true and correct copies of the *February 27, 2023 Mailings to Durham Drive and Janesville Road Returned to Sender*, respectively, which are stored in the Board's case-management system.

6.     Upon the February 27, 2023 letter being returned, I contacted a

process server to serve the same letter on Tim Dillett. Attached as Exhibit 4 is a true and correct copy of *Gino Hoffman's March 20, 2023 Affidavit of Service*, which is stored in the Board's case-management system.

7.      Attached as Exhibit 5 is a true and correct copy of *Richard Neuman's June 14, 2022 Letter to Tim Dillett*, which is stored in the case-management system.

8.      Attached as Exhibit 6 are true and correct copies of the *Returned Envelopes of the June 14, 2022 Mailings*, which are stored in the Board's case-management system.

9.      I certify under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge.

s/Arish S. Ali_____
Arish S. Ali

**National Labor Relations Board**
Contempt, Compliance, and Special
Litigation Branch
1015 Half Street, SE, 4th Floor
Washington, D.C.  20003
Email: Arish.Ali@nlrb.gov
Fax: (202) 273-4244

Dated:   August 21, 2023
            Washington, D.C.